ATCHISON, T. & S. F. RY. CO. v. SMITH et al. (No. 8417.)

(Court of Civil Appeals of Texas. Ft. Worth. Oct. 28, 1916. On Motion for Rehearing, Dec. 23, 1916.)

1. JUDGMENT ⊜⟞256(1)—VERDICT—ON TRIAL —SUPPORT BY EVIDENCE.

Judgment must follow the verdict, and an assignment questioning the authority of the court to enter a judgment contrary to the verdict simply because the verdict is unsupported by the evidence cannot be sustained.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 446, 454; Dec. Dig. ⊜⟞256(1).]

**2.** NEW TRIAL ⊙⟼10—PRECLUSION FROM MOVING FOR ON GROUND OF INSUFFICIENCY OF EVIDENCE—MOTION FOR JUDGMENT CONTRARY TO VERDICT.

After judgment is rendered in accordance with the verdict, the losing party is not precluded from moving for new trial on the ground of the insufficiency of the evidence to support the verdict because previous to the rendition of the verdict he made an unsuccessful attempt to have a judgment rendered contrary to it.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 13, 115, 131; Dec. Dig. ⊙⟼10.]

**3.** TRIAL ⊙⟼274 — OBJECTION TO CHARGES — SUBMISSION TO OPPOSING COUNSEL—STATUTE.

Vernon's Sayles' Ann. Civ. St. 1914, art. 1971, providing for the submission to opposing counsel as well as the court of requested instructions, does not require the submission to opposing counsel of objections made to the charges given.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 687; Dec. Dig. ⊙⟼274.]

**4.** APPEAL AND ERROR ⊙⟼544(1)—RESERVATION OF GROUNDS OF REVIEW—EXCEPTION TO CHARGE.

It is not necessary to take a bill of exception to a charge given by the court as a prerequisite to the right to complain of such instruction on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 2412; Dec. Dig. ⊙⟼544(1).]

**5.** APPEAL AND ERROR ⊙⟼927(6)—PRESUMPTIONS FAVORING COURT BELOW — SUBMISSION OF MOTION FOR PEREMPTORY CHARGE TO OPPOSING COUNSEL—STATUTE.

Without a showing to the contrary, it must be presumed that the trial judge would not have passed upon a motion for a peremptory instruction without requiring its submission to opposing counsel in compliance with Vernon's Sayles' Ann. Civ. St. 1914, art. 1971.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3748; Dec. Dig. ⊙⟼927(6).]

**6.** RELEASE ⊙⟼57(2)—INCAPACITY AND FRAUD —SUFFICIENCY OF EVIDENCE.

In a railroad employé's action for injuries, evidence *held* insufficient to support the jury's findings that he was mentally incompetent to make a valid contract of settlement, and that he was induced to make it by misrepresentations by the claim agent of the railway and by undue influence exercised upon him.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 108; Dec. Dig. ⊙⟼57(2).]

**7.** RELEASE ⊙⟼17(2) — VALIDITY—DISPARAGING REMARKS AS TO INJURED PERSON'S ATTORNEY.

Misrepresentations by a railroad's claim agent to its injured employé concerning the services to be rendered by some of his attorneys did not of themselves constitute a sufficient basis for rescission of the contract of settlement, where the testimony introduced in support of rescission on the ground of the employé's incompetency and the claim agent's fraud was insufficient.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 32; Dec. Dig. ⊙⟼17(2).]

**8.** RELEASE ⊙⟼17(2), 19 — VALIDITY — FRAUD OR UNDUE INFLUENCE.

Arguments made to its injured employé by a railroad's claim agent, to induce him to settle, relative to the delays and uncertainties of bringing action, were not, under the circumstances, the employé having fully understood conditions, fraudulent, and did not amount to undue influence.

[Ed. Note.—For other cases, see Release, Cent. Dig. §§ 32, 33; Dec. Dig. ⊙⟼17(2), 19.]

**9.** RELEASE ⊙⟼18.— VALIDITY — FINANCIAL DISTRESS.

The distressed financial circumstances of a railroad's employé when he settled his claim did not, standing alone, furnish sufficient basis for rescission of the settlement.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 33; Dec. Dig. ⊙⟼18.]

**10.** RELEASE ⊙⟼12(3)—INADEQUACY OF CONSIDERATION.

Where a railway company was liable for injuries sustained by its employé for $8,000 reasonable damages, but the issue of liability was doubtful and by settlement the delay and annoyance of litigation was avoided, while in his suit after settlement the employé was awarded only $1,850 in addition to the $3,750 he had received in the settlement, there was no such gross inadequacy of price paid for the settlement as of itself to constitute a badge of fraud practiced upon the employé.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 20; Dec. Dig. ⊙⟼12(3).]

**11.** MASTER AND SERVANT ⊙⟼276(9)—INJURY TO SERVANT—NEGLIGENCE—SUFFICIENCY OF EVIDENCE.

In a railroad employé's action for injuries, evidence *held* sufficient to support the jury's findings that another employé of the road was guilty of negligence which was the proximate cause of the injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 951, 959, 976; Dec. Dig. ⊙⟼276(9).]

**12.** NEGLIGENCE ⊙⟼121(5)—PROXIMATE CAUSE —BURDEN OF PROOF.

When one seeks to recover damages of another caused by his negligence, it is incumbent on him to establish by competent proof not only the negligence alleged, but also that it caused the injury.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. § 228; Dec. Dig. ⊙⟼121(5).]

**13.** MASTER AND SERVANT ⊙⟼287(5)—INJURIES TO SERVANT—QUESTION FOR JURY.

In a railroad servant's action for injuries, the decision of the issues of fact whether another railroad employé pulled the stake that released the timbers that fell, and whether the timbers fell in fact as a result of the act, *held* for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1061; Dec. Dig. ⊙⟼287(5).]

**14.** TRIAL ⊙⟼105(1)—RECEPTION OF EVIDENCE —FAILURE TO OBJECT—INCOMPETENT TESTIMONY.

A verdict cannot be sustained by incompetent testimony, even though admitted without objection.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 260, 261, 266; Dec. Dig. ⊙⟼105(1).]

**15.** EVIDENCE ⊙⟼75—FAILURE TO PRODUCE—PRESUMPTION.

The failure to produce evidence peculiarly within the knowledge of a party will raise a presumption against him, and every reasonable intendment will be in favor of his opponent upon that issue.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 95; Dec. Dig. ⊙⟼75.]

### On Motion for Rehearing.

**16.** APPEAL AND ERROR ⊙⟼1173(1)—REVERSAL IN FAVOR OF ONE PARTY—EFFECT.

Where the recovery awarded attorneys suing a railroad and its injured employé was conditioned upon the liability of the road for the damages in excess of the amount already paid the employé in settlement, a reversal in favor

of the road operated as a reversal of the entire judgment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4562–4567, 4569, 4656; Dec. Dig. ⟨⟩1173(1).]

17. APPEAL AND ERROR ⟨⟩1173(1)—DETERMINATION — REVERSAL IN PART — CODEFENDANTS.

A railroad's injured employé assigned to his attorneys three-tenths of his cause of action, stipulating that in case compromise was made before suit the attorneys should receive 15 per cent. of the amount agreed on. The employé compromised his claim before suit and the attorneys sued the railroad and their assignor. The latter cross-complained, alleging invalidity of the settlement. There was judgment canceling the settlement, for damages on the cross-complaint and for plaintiffs for three-tenths of the award. Held that, on the reversal of the judgment against the railway company, the court should merely modify the judgment for plaintiffs, as against their assignor, by allowing them 15 per cent. of the sum received by him.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4562–4567, 4569, 4656; Dec. Dig. ⟨⟩1173(1).]

Error from District Court, Tarrant County; R. B. Young, Judge.

Suit by Mike E. Smith, Leonard M. Levy, and G. W. Dunaway against the Atchison, Topeka & Santa Fé Railway Company, Pecos & North Texas Railway Company, First National Bank of Sweetwater, and L. M. Dunaway, wherein L. M. Dunaway filed an answer to the petition, and also a cross-bill against the railway companies. Plaintiffs and L. M. Dunaway dismissed their respective suits against the Pecos & North Texas Railway Company, and plaintiffs also dismissed as to the First National Bank of Sweetwater. To review a judgment for plaintiffs against the Atchison, Topeka & Santa Fé Railway and L. M. Dunaway, and in favor of L. M. Dunaway against the railway, the railway brings error. Reversed as to defendant railway company, and modified as to defendant Dunaway.

Terry, Cavin & Mills, of Galveston, for plaintiff in error. O. W. Gillespie, G. W. Dunaway, Walter Nelson, and Stanley Boykin, all of Ft. Worth, for defendant in error L. M. Dunaway. Mike E. Smith and G. W. Dunaway, both of Ft. Worth, for defendant in error Mike E. Smith and others.

DUNKLIN, J. On September 28, 1912, L. M. Dunaway was in the employment of the Atchison, Topeka & Santa Fé Railway Company as a bridge carpenter in New Mexico, and while unloading bridge timbers from a freight car, in the performance of the duties of his employment, some of the timbers fell upon him and seriously injured him. The timbers had been loaded upon the car to a height of the aggregate thickness of about 20 pieces, and in order to hold the timbers in place, upright stakes extending above the top of the pile of timbers had been placed in sockets in the outer edges of the sides of the car. George Bridwell, another employé, was engaged in assisting Dunaway in unloading the car. Other employés were also engaged in the work of unloading, but they were unloading from one side of the car while Dunaway and Bridwell undertook to unload from the other side. The plan adopted by Dunaway and Bridwell for their work was to remove the upright stakes, then to throw off the bridge timbers to the ground. In pursuance of that plan, they first pulled the stakes from the ends of that side of the car, but were unable to. pull another intervening stake midway between the two ends by reason of the fact that the same was fast in its socket. Dunaway then left Bridwell on top of the timbers for the purpose of loosening the stake by driving it from its lower end. In order to accomplish this he procured a piece of iron used on the engine called a "shaker bar." With this bar he struck the stake a few blows, and as it came out of its socket several pieces of the bridge timbers tumbled to the ground, and in falling struck Dunaway, breaking an arm, both shoulders, one of his legs, and also his jaw. On account of these injuries he was taken to the railway company's hospital at Topeka, Kan., where he remained until August of the following year. Before leaving the hospital some of the agents of the railway company stationed there proposed a settlement of any claim he might have for damages against the railway company for his injuries. Dunaway indicated a willingness to settle, but no settlement was consummated by reason of the fact that no agreement could be reached with respect to the amount of money he should receive. On September 27, 1913, about one month after leaving the hospital, Dunaway addressed a letter to Hamilton, a claim agent of the railway company at Topeka, Kan., suggesting that if a settlement of the claim was desired Hamilton should meet him either at Sweetwater or Ft. Worth, Tex., and requesting an immediate answer as to the time and place the claim agent would agree to meet him. That letter was referred to Bowman Jarrott, the company's claim agent located at Amarillo, Tex., who, in response thereto, wrote Dunaway that he would meet him at McCauley, Tex., where Dunaway was then located, and on November 11, 1913, the day of that meeting, a contract of settlement in full of Dunaway's claim was consummated between Dunaway and the company acting through Jarrott, as its claim agent, Dunaway signing a receipt in full of all claims growing out of the injuries so sustained by him, and receiving from the company in consideration of such contract the sum of $3,750.

On December 5, 1913, this suit was instituted by Mike E. Smith, Leonard M. Levy, and G. W. Dunaway, practicing attorneys at Ft. Worth, Tex., against the Atchison,

Topeka & Santa Fé Railway Company, Pecos & North Texas Railway Company, First National Bank of Sweetwater, and L. M. Dunaway. In their original petition, plaintiffs set out the accident to L. M. Dunaway, alleging that it was caused through the negligence of the agents of the defendant companies, which was the proximate cause of L. M. Dunaway's injuries, and by reason thereof he had sustained damages in the sum of $50,000. It was further alleged that Dunaway had settled his claim for damages with said company for the sum of $3,750, but that prior to such settlement he had employed the plaintiffs as his attorneys to institute and prosecute a suit to recover damages for said injuries, and in consideration of such services Dunaway had transferred and assigned to the plaintiffs an undivided three-tenths interest in and to his cause of action against said companies for said injuries. It was further alleged that the companies had notice of such assignment at the time the settlement was made. In their petition plaintiffs prayed for judgment against the companies for three-tenths of the actual damages so sustained by L. M. Dunaway, and in the alternative prayed for a judgment against the railway companies and Dunaway for three-tenths of $3,750, the amount for which Dunaway had settled his claim. Judgment was also sought against the defendant bank, upon the ground that the money collected by Dunaway had been there deposited to his credit.

L. M. Dunaway filed an answer to the plaintiffs' petition, and also a cross-bill against the railway companies, in which he alleged that the contract of settlement was invalid by reason of the fact that he was mentally incapacitated at the time to enter into a legally binding contract; that the amount received by him was wholly inadequate as a consideration for the injuries he sustained in said accident; that at the time of the settlement he was in distressed financial circumstances and was induced to make the settlement by reason of certain false representations to him by the agent, the character of which misrepresentations will be hereinafter noticed. He further alleged that the railway companies were liable to him for the injuries sustained, by reason of the fact that the same were proximately caused through the negligence of their agents, and he asked for judgment in the sum of $50,000 damages therefor, less the amount, $3,750, he had received from the Atchison, Topeka & Santa Fé Railway Company.

The plaintiffs also filed an amended petition, containing, substantially, the same allegations relative to the settlement as were contained in Dunaway's cross-bill. The truth of all such allegations was put in issue by appropriate pleading on the part of the defendant railway companies.

Upon the trial of the case the plaintiffs and L. M. Dunaway dismissed their respective suits against the Pecos & North Texas Railway Company, and the plaintiffs also dismissed their suit against the First National Bank of Sweetwater. The trial was before a jury, and upon the verdict in answer to special issues a judgment was rendered canceling the contract of settlement made by Dunaway, and in favor of plaintiffs against the railway company and L. M. Dunaway for the sum of $2,400, and in favor of L. M. Dunaway against the railway company for $1,850, or an aggregate of $4,250, which was $8,000, less the $3,750 already paid to Dunaway. The amounts of such recoveries were based upon the finding of the jury that Dunaway had sustained damages in the sum of $8,000. From that judgment the Atchison, Topeka & Santa Fé Railway Company has prosecuted this writ of error.

Defendants in error have objected to a consideration of practically all assignments of error contained in the railway company's brief.

We find in the record that the railway company made a motion for a judgment to be entered in its favor, notwithstanding the verdict of the jury on special findings, and the contention is made that as the judgment must follow the verdict, and as no other judgment could have been rendered upon the verdict than the one that was rendered, the railway company is precluded from complaining, as is done in nearly all of the assignments, that the verdict upon the controlling issues is unsupported by the evidence. In support of that contention such decisions as Blackwell v. Vaughn, 176 S. W. 912, Ripley v. Wenzel, 139 S. W. 897, and Weinstein v. Acme Laundry, 166 S. W. 126, are cited. In the case of Blackwell v. Vaughn, 176 S. W. 912, this court, speaking through Chief Justice Conner, used the following language:

"In the case of Scott v. F. & M. Nat. Bank, 66 S. W. 485, by the Court of Civil Appeals for the Third District, it was held, upon reasoning and authorities which we approve, that, where a party on appeal fails to assign error to the action of the court in refusing to set aside a special verdict, he cannot complain of the judgment on the ground that the findings are unsupported by the evidence."

The other decisions cited above are to the same effect.

Those decisions have no application here since the railway company presented a motion for a new trial in the trial court containing numerous grounds, to the effect that the evidence was insufficient to sustain a verdict against it upon the several issues submitted; that by reason of that fact the court erred in submitting those issues to the jury as controverted issues of fact; that the findings of the jury upon those issues could not be sustained; and further that for lack of sufficient evidence to sustain the issues the court erred in refusing the railway company's requests for a peremptory instruction to return a ver-

dict in its favor against the suits, both of plaintiffs and L. M. Dunaway.

[1] It is well settled by the decisions of this state that the judgment must follow the verdict, and an assignment questioning the authority of the court to enter a judgment contrary to the verdict simply because the verdict is unsupported by the evidence cannot be sustained. Waller v. Liles, 96 Tex. 21, 70 S. W. 17; H. & T. C. R. Co. v. Smallwood, 171 S. W. 292.

[2] But we know of no decision holding that after judgment is rendered in accordance with the verdict, the losing party is precluded from moving for a new trial on the ground of the insufficiency of the evidence to support the verdict, by reason of the fact that previously to the rendition of the verdict he had made an unsuccessful attempt to have a judgment rendered contrary to the verdict.

It is further insisted that the bills of exception taken by the railway company to the action of the trial court in submitting to the jury the special issues do not show that the company's objections made to those instructions at the trial were submitted to opposing counsel for consideration before such instructions were given to the jury.

[3, 4] This contention is overruled for two reasons: First, article 1971, Vernon's Sayles' Texas Civil Statutes, and upon which the contention is predicated, provides for the submission to opposing counsel, as well as the court, of requested instructions, but does not require the submission to opposing counsel of objections made to the charges given; and, second, it is now settled by the decision of the Supreme Court that it is not necessary to take a bill of exception to a charge given by the court as a prerequisite to the right to complain of such instruction on appeal. G. T. & W. Ry. Co. v. Dickey, 187 S. W. 184.

The record shows that before the trial judge decided to submit the case to the jury on special issues, the railway company moved for a peremptory instruction in its favor with respect to the demands asserted against it both by the plaintiffs and by L. M. Dunaway, on the ground that the evidence was insufficient to support a recovery against it by either of those parties; the insufficiency of the evidence on several of the material issues being specially pointed out. Objection is made to the consideration of assignments of error to the refusal of that motion upon the ground that the bill of exception to the action of the court in refusing the motion does not show that the requested instruction was submitted to opposing counsel, as well as to the court before the court's action thereon.

[5] In the absence of any showing to the contrary, it must be presumed that the trial judge would not have passed upon the motion without requiring a submission of the same to opposing counsel in compliance with the terms of the statute. Furthermore, the same questions presented by the motion for an instructed verdict are raised in other assignments to the action of the court in submitting, as controverted, the controlling issues in the case to the jury, for lack of evidence to support findings thereon adverse to the railway company; and as settled by our Supreme Court in Railway v. Dickey, supra, the railway company was not required to take bills of exception to those instructions as a predicate for its right to complain of the same here.

We find no merit in the further objections to the assignments on the ground that there has been an improper grouping of the same, and that the propositions thereunder are not followed by proper statements of the evidence.

As grounds for setting aside the contract of settlement made by Dunaway for his injuries, it was alleged that Dunaway was not mentally competent to realize and understand the effect and consequences of the consummation of such a contract, and that he was induced to make the same by false representations made to him and undue influence exercised upon him by the claim agents of the railway company; and that $3,750, the amount paid to Dunaway by the company, was wholly inadequate as compensation for the injuries he sustained. Those issues were submitted to the jury, and the manner of submitting the same, together with the findings of the jury thereon, are as follows:

Fifth Special Issue: "Was the amount of $3,750 received by said Dunaway for signing said release adequate compensation for his injuries?" Answer: "No."

"You are instructed that the burden is on said L. M. Dunaway to establish to your satisfaction, by a preponderance of the evidence that the execution of said release was not his free and voluntary act, and that he was not mentally competent to execute said release and to realize the effect and consequence of same."

Sixth Special Issue: "If in answer to the above question, you say that said sum of $3,750 was adequate compensation for the injuries of said L. M. Dunaway, then it will not be necessary for you to answer any of the following questions; but, on the other hand, if your answer should be that said sum was not an adequate compensation for said injuries, then you will answer the following questions:

"At the time he signed said release, was said L. M. Dunaway mentally competent to transact important business and to enter into and carry to consummation a settlement of his claim for damages against the said railway company with the claim agent, Bowman Jarrott?" Answer: "No."

Seventh Special Issue: "Did any claim agent or claim agents of the defendant railway company, prior to and at the time of the execution of the release by L. M. Dunaway, knowingly make any false representations to the said L. M. Dunaway and upon which the said L. M. Dunaway relied and which caused and induced the said L. M. Dunaway to execute this release that he would not otherwise have executed?" Answer: "Yes."

Eighth Special Issue: "If you should find that L. M. Dunaway at the time he signed said release was not mentally competent to transact important business and to make a settlement

of his claim for damages with claim agent Bowman Jarrott, then was he induced to sign said release through undue influence exerted on him by said Bowman Jarrott, the claim agent of defendant railway company; that is, did the said Bowman Jarrott take advantage of said Dunaway's impecunious and mental condition or either of them, if either or both existed, or did he make such allusions to, or representations of, the impecunious condition of said Dunaway, if same existed, or employ any persuasions or artifices as alleged in said Dunaway's pleadings, and in evidence before you, if any are in evidence, to such an extent as that the said L. M. Dunaway was imposed upon and overcome by same, and was thereby deprived of the free use and exercise of his free will in the execution of said release, and but for which he would not have executed the same?" Answer: "Yes."

[6] By appropriate assignments of error, it is insisted that the evidence was insufficient to support the findings of the jury that Dunaway was mentally incapacitated to make a valid contract of settlement, and that he was. induced to make the same by misrepresentations on the part of the claim agent of the railway company, and by undue influence exercised by them upon him. After a careful consideration of all the evidence bearing upon those issues, we are of the opinion that those assignments should be sustained.

Four witnesses were introduced to sustain the allegation of mental incapacity, namely, Dr. W. F. Britton, W. I. Agnew, Mrs. L. M. Dunaway, wife of defendant in error Dunaway, and J. E. Dunaway, his father. Dr. Britton had known L. M. Dunaway for some 22 or 23 years, and had practiced medicine in his family. After Dunaway left the hospital at Topeka, he came to Texas and called upon Dr. Britton, who lived in Putnam, for further treatment of his injuries. Dr. Britton testified that in the summer of 1913 he treated Dunaway for his injuries. Witness had been Dunaway's father's family physician at Dothan, Tex., and had treated L. M. Dunaway himself while a boy, but had not seen him since his boyhood. During Dunaway's first visit to the office of witness in Putnam in the summer of 1913, he said to witness:

"You see I used to live at Dothan here; you see I was raised here, and father lives there."

This statement was made after Dunaway had talked with the witness for an hour and there had been no previous reference to the fact that he knew witness. Based on that statement by Dunaway, under the circumstances referred to, in connection with the fact that during one of his visits he repeated what he had told on a former visit, to the effect that he had been engaged in railroad work, had been hurt and had been in a hospital, and the further fact that Dunaway's appearance had changed since witness last saw him, witness gave it as his opinion that at the time of the settlement with the railway company, Dunaway was mentally incapacitated to make such a settlement. However, he further testified on cross-examination that such opinion was formed at the time

of his treatment of Dunaway, and that notwithstanding such opinion he then advised Dunaway to settle his claim for damages with the railway company without the aid of lawyers, as witness was satisfied the company would treat him fairly.

Mrs. L. M. Dunaway testified that after his injuries there was a change in the mental condition of her husband; that his mind seemed more like that of a child; that he would forget things and seemed unable to realize how to do things; that he would start to work, would forget what he had started to do, and would not know how to begin. To illustrate, she said that on one accasion his little boy turned over to him a cotton planter which the boy had been operating, and her husband ran the planter for half a day without any seed in it; that in feeding his stock he would sometimes give a double portion to a horse, and on one occasion he directed a hired man to do certain work and later was under the impression that he had assigned work of a different character; she further testified that he loaned out some of the money he received in the settlement without taking notes for it, one of said loans being $150 to a half-brother of Mrs. Dunaway, over her protest to her husband at the time, but that she did not make known to the borrower her objections. Witness also said that her husband would sometimes drink to excess when he went to McCauley, and sometimes he would bring whisky home with him and place it in the house or barn; that witness had seen him intoxicated but that he was not in that condition when he ran the cotton planter without seed. She further testified that before the settlement she told the father of L. M. Dunaway her opinion of the latter's mental condition, but that she did not mention it to his brother George, although she stayed at his house. No testimony was introduced to show that this witness made any objections to the settlement between the date of its consummation and the date her husband decided to repudiate it.

J. E. Dunaway testified:

"His mental condition, I call it pretty weak, the way I looked at it."

When questioned to give the basis of that opinion, he answered:

"Well, from his general conversation, and he did not seem to have any self-will about him or any self-resistance, and little things that way that he did—that he would do—he could not depend on himself; seemed like he wanted to depend on himself; * * * " that in conversation, his son would start on one subject and then drift to some other, somewhat after the manner of a child, and perhaps in a little while repeat what he had said already.

He further testified that his son loaned some of the money paid him by the railway company to some of his friends without taking any notes or security therefor; one of said loans being in the sum of $50 to one of his brothers. This witness was present on the

occasion of the settlement, having gone to McCauley for that purpose at his son's request. He testified that there was quite a lengthy discussion between Jarrott and his son, L. M. Dunaway, relative to the matter; that Jarrott offered him $3,750, but that his son declined to accept that offer at first, and to the best recollection of the witness his son demanded $8,000; that his son and Jarrott then separated, Jarrott still offering $3,750, and his son still declining that offer; that later L. M. Dunaway and Jarrott had another meeting when the witness was not present, after which L. M. Dunaway reported to the witness that he and Jarrott had agreed on the settlement for $3,750, and that he signed the contract of settlement as a witness. But nowhere did he testify that he ever made any objection to the settlement, either to Jarrott, or to his son, on the ground that his son was not mentally capacitated to make a legally binding contract of settlement.

W. I. Agnew, a farmer, knew L. M. Dunaway about 20 years, during which time they were neighbors in the vicinity of Dothan. Witness met him in Cisco, Tex., after the accident and during the summer of 1913. He was then badly crippled. He said to witness:

"You ought to remember me; I used to be an old settler out in that country around Dothan."

From that and other queer remarks in connection with the fact that he would start a conversation and leave it unfinished and seemed more like a child than like a man, witness reached the conclusion that there was "something wrong with his mind."

At best, such testimony would not support any stronger conclusion than that L. M. Dunaway was perhaps mentally weak, and frequently suffered from lapse of memory and absent-mindedness.

Opposed to such a conclusion was the testimony of L. M. Dunaway, himself, given upon the witness stand. His testimony was at great length, covering more than 100 pages in the statement of facts before us. That testimony was clear and distinct, showing no apparent lapse of memory with regard to the facts of his entire case including the negotiations with different agents of the company relative to a settlement of his claim for damages, while he was in the hospital at Topeka, as well as those with Jarrott which culminated in the execution of the contract by him, and the receipt by him of the $3,750. Nor does he claim that he did not understand the contract, or the legal effects thereof. He details the conversation between himself and Jarrott at McCauley, Tex., at the time of the settlement practically the same as did his father on the witness stand. In very clear terms he gives his reasons for accepting Jarrott's proposition of settlement, and his testimony shows clearly that he thoroughly understood it and the legal consequences thereof. Furthermore,

it is shown by uncontroverted proof that after the settlement, and with a part of the money he received as a consideration therefor, he purchased a farm upon which he made a home for his family; that such purchase was in accordance with his plans previously discussed with his father; that no complaint was made by him that the settlement was not binding upon him until after his brother, George W. Dunaway, had by letters to him shown in the statement of facts repeatedly insisted that he pay his attorneys their proportion of the amount received as their fee according to his contract of employment of them, which demand he had refused; and after a suggestion made in later letters from G. W. Dunaway that he stand by the attorneys in the suit which they proposed to institute against the railway company to recover from the company upon that portion of the original cause of action which L. M. Dunaway assigned to them, and after L. M. Dunaway, on January 27, 1914, more than 2 months after the settlement, had given to the railway company an affidavit to the effect that the written contract of assignment made with his attorneys had been delivered to his brother, G. W. Dunaway, with the distinct understanding that the latter should hold it in escrow, and it should not be delivered or become effective "until it should become apparent that suit must be brought against said railway company upon said cause of action," and with the further understanding and agreement with said G. W. Dunaway that affiant "should go ahead and undertake to adjust his claim with said railway company without suit, and that if affiant did succeed in settling said claim with said railway company without suit, no part of same should go to said attorneys, and said attorneys would not be entitled to and were not to receive any part of the proceeds of said settlement." The affidavit contained the further statement that affiant and Bowman Jarrott, a claim agent of the railway company, had already "agreed upon a full and final settlement of said claim satisfactorily alike to affiant and said agent. * * * Affiant further states that he feels that he has in this matter pursued a just, fair, and conscientious course, and by settling said claim amicably between both parties he has avoided unnecessary and probably long drawn out litigation, and all the worry, suspense, and expense usually attending such litigation, and that he did so at his own expense and of his own free will, and that in doing so he but followed out the letter and spirit of the understanding and agreement had with the said G. W. Dunaway, and that by the very terms of said agreement, the said contract with the said G. W. Dunaway never became effective for any purpose whatever." It further appears that in addition to giving the railway company that affidavit, L. M. Dunaway turned

over to the company the letters he had received from G. W. Dunaway referred to above, and that his original answer and cross-bill in the present suit was not filed until July 15, 1914. Upon the witness stand no contention was made by him that he did not understand the full import of that affidavit.

His testimony, especially when viewed in connection with the facts just enumerated, conclusively establishes the fact that if he was weak-minded, such mental condition was not such as to preclude him from a thorough understanding of the terms of the contract and of the legal consequences of executing it. Relative to the alleged misrepresentations and undue influence which caused L. M. Dunaway to agree to the settlement he, after testifying that before he left the hospital at Topeka, Mr. Hemus, an agent of the railway company, offered him $1,500 in settlement of his claim, which offer was refused, further testified to the negotiations between him and Jarrott at their meeting in McCauley on the occasion of the settlement:

"I believe it was on Monday that Mr. Jarrott was at McCauley. He came around to the blacksmith, inquiring about me. It was Mr. Hendon's blacksmith shop. McCauley is a small place; it had three or four stores. I had been there but a short time when Mr. Jarrott came. My father was with me. I did not know that Mr. Jarrott was in town until he walked into the blacksmith shop. He introduced himself to me. He asked me to come and go over to the hotel and we would talk our business over. There was nothing else said while we were at the blacksmith shop, that I remember. He had told me who he was. Mr. Jarrott and I went over to the hotel. I think my father came over later. The hotel was just across the road like from the blacksmith shop. We talked about the claim. Mr. Jarrott had the parlor for his room; we went in there to talk. It was about 9 or 10 o'clock. We talked about Hemus and what he said to me. I don't know as I can give you just his exact words; we had a general conversation about it. He said Hemus never offered me enough for my settlement, and he was willing to offer me more.

"Q. Now, how much had Mr. Hemus offered you at that time? A. He had offered me $1,500. Q. Had you ever been offered more than $1,500 at that time by any one of the agents? A. Why, no, sir; I don't believe I had. We would talk about the settlement for a while and then branch off on other subjects. We talked about farming and buying land. He said a man could get a little farm if he had a little money, and do better than he could railroading. He told me his experience; how he had made money farming and had educated himself. He said he made a good wheat crop and got the money and went to school; that he liked farming better than anything. He had not made me an offer; only told me he would do better than Hemus. He had made an offer two or three times during the day. I don't think I made him any offer. I believe his first offer was $2,500. I remember he told me it could be proved that the company was not liable for my accident, but he wanted to treat me right about it; that I had been a good man amongst them and had always treated them right, and they wanted to treat me all right. I told him that the company was liable and that I had got up statements that the company was liable, that I had statements from some of the witnesses, and he wanted to know who they were. I told him George Bridwell, and I told

him what Bridwell had stated, and he showed me a statement from Bridwell that was different, and he said, 'Now, of course, that would throw his evidence out; we would not have his evidence at all, if he had given you one statement and made another here; we cannot use him at all.' I did not have Bridwell's statement with me, but told him what was in it. He showed me the statement he had from Bridwell and read it over to me. He also had a statement from me taken pretty soon after I went to the hospital. He showed it to me and said that I had stated in it that I did not blame the company, nor any of the employés. I made that statement while I was at Topeka; my signature was to it. I don't remember just how long it was after I went to the hospital, possibly 30 days; I was in bed; one of the claim agents got the statement from me. I don't know his name. Mr. Jarrott told me he was dead. I was in the sick ward when that statement was made. I was in bed, and was suffering very much; was in bad condition. When Mr. Jarrott showed me the statement in Bridwell's handwriting, he said it would be a case of testing in court whether I would get anything or not, and it would be a long time in court and maybe not get anything, and it was best to settle these things and not take a chance like that. That he wanted to treat me right and would do all he could to help me out. I believe it was at the hotel we were talking. We were talking about lawyers, and I was telling him I had lawyers for my case and had evidence—these statements that I was telling him about when he showed me these other statements, and asked me who my lawyers was—I told him it was Dunaway and Mike Smith and Levy, and I thought that Turner & Odell was in the bunch; they were in the office with Mike Smith."

He further testified that Jarrott then made some statements in disparagement of the efficiency of service which some of his attorneys would render him in the event of a suit on his claim for damages—and which statements, if any, are not supported by the record in this case, but limiting those statements to some of the attorneys only, and in connection therewith, saying, in substance, that they did not apply to another of Dunaway's attorneys whose name was mentioned. The witness further testified:

"During the conversation with Mr. Jarrott we mentioned my family; I don't remember just what was said. I told him the condition I was in; that I was down there without any money and had to go to Mexico to make proof on our land. I think I made him an offer; the lowest offer I made him was $4,000. That was the last offer. I had been holding out with Topeka for $8,000. I told Mr. Jarrott that I was holding out for this amount—that I offered. That was after we got to the hotel; I don't remember how long after. It was soon as the subject of settlement was raised. He told me they would not give that at all, but they would give me more than Hemus offered. I do not remember just how long we had been at the hotel before my father came. It was not very long afterwards. I signed the release about 4 o'clock; we had gone down to the depot and were waiting for the train—the train was a little late. My father was with us part of the time; he was out and in. Mr. Jarrott said they had as good lawyers as there was in the country; I cannot tell all was said about; I do not know. He said the railway company was always prepared for suits, and had plenty of lawyers to fight these suits, and was plenty able to go through with a suit, but they did not like to go into a suit because they wanted to keep out of

these suits and get by and treat the people right
and get on without suits. In our conversation,
we discussed the hospital doctors and both of
us bragged on them being such fine physicians.
He told me he would almost fight a man if he
heard him say anything about Dr. Freeman as
a physician. I believe he asked me if Dr.
Freeman did not think I would get along all
right, and I told him that he did. My wife
spent about two months at the hospital; she went
up with me when I was hurt; and she came
back about Christmas; I believe Christmas Day.
She stayed with me until I was dismissed from
the hospital—supposed to have been well. I
think it was in February or March. When we
got to Clovis, my leg was taken awful bad
again. The doctor at Clovis told me the best
thing for me to do was to go back to the hospi-
tal as soon as I could; she was not with me
any more until in July, I guess it was; her
and the children came up there. I do not re-
member whether Jarrott mentioned my wife that
day at the hotel or not. We talked about my
ability to make money or to accumulate any-
thing railroading. I had been railroading for a
long while and had not accumulated anything,
and probably would not accumulate if I con-
tinued to work for them. I told him I was out
of money and transportation, and had to be in
Mexico to make proof on my land, and he said
he would send me transportation for myself
and family to Mexico and return, and to the
hospital as long as I would want it. He said
my making a settlement would not have any-
thing to do with my not going back to the hos-
pital.

"In our discussion of my future employment
I do not think my working for the railroad was
considered; I do not remember that it was. I
don't remember that he told me any jokes; I
had them told to me, but I don't know that he
told them. He told me about some other people
that had been hurt and who wanted more than
they got—the history of other lawsuits. I don't
know that I can remember; that I can tell any
of them. He told me of one person that the
company had offered to make a settlement with
and she refused to take it, but went to law
about it, and the jury gave the judgment for
the same amount, and after the lawyers' fees
was paid she never got nothing like what the
company had offered her. Her brother would
not let her settle, and wanted her to carry it
on and they lost out; they had been enemies
ever since. We talked some about the Knights
of Pythias. I don't know just how it came up;
we found that we were both K. P.'s, and I told
him I had rather make a settlement with a man
of the same order with me as any other man
because I felt like he was; would treat me
right more than the other man would. I can-
not say exactly how long it was after we left
the hotel before we made the settlement. The
train was late, and I should think it was not
more than an hour after we left the hotel before
we came to an agreement. He said he had to
leave that evening, because he had some other
business to see about; I think he said it was
getting up some evidence somewhere. Mr. Jar-
rott and me went down to the depot together;
father came later on, just before the train left.
We had made the settlement before he came.
Mr. Jarrott told me if he was to give me 50
cents more, he would have to give it out of his
own pocket. I think there was something
said about his seeing me again, but I don't just
remember. I was very much disturbed over
my condition. Winter was coming on, and I
was not able to work, and me and my family
was tied up; we were just on the tramp. My
boy was nine years old, and the girl was five.
You asked that if the statements he made about
the lawyers—if I believed it? I think I did.
I did not know but what it might be that way;
I had not been around these lawyers any and
had never had any dealings with lawyers; in

fact, I had not been around my brother except
only just to see him every three or four years.
I believed the statement of Mr. Jarrott, that
the Santa Fé had good lawyers, and I knew
they would not have any but good lawyers.
Q. At the time you talked to Mr. Jarrott and
he was making the statement to you that the
Santa Fé wanted to be fair, etc., state whether
you believed the statement. A. Why, I don't
remember whether I believed that statement.
Q. Yes. A. Why, yes, I believed that Mr. Jar-
rott was giving me all that he was allowed to
give me, while I did not think that he was— Q.
Well, Luther, state when you signed that re-
ceipt or release for $3,750; state whether you
relied and believed these statements told you
by Mr. Jarrott during the conversation that
day. A. Yes, sir. I cannot recall every word
that passed between me and Mr. Jarrott at the
time I signed the release. The last word he
said was, that if he gave me 50 cents more he
would have to give it out of his own pocket.
While we were at the hotel I think he offered
me $3,500. The offer of $3,750 was made after
we went to the depot. I had come down to
$4,000. After we went to the depot, in talk-
ing about the settlement, he spoke of buying
a farm, and said that $500, or even $1,000,
would not have much to do with making a good
trade now on a farm, and I don't remember all
he said, but something was said about $250 or
$500, or $750 in a good deal in a farm, would
not have much effect on it, because five years
from now—might not get the money for five
years from now, and might not get it then, and
might run in court for five years, and the place
would be worth much more and a man would
take a chance on getting this money any way.
He paid the money to me in a check; it was a
check on the Atchison, Topeka & Santa Fé
Company, and he said I could get it cashed
most anywhere in the banks. He told me not
to keep it any longer than I could get some-
where and deposit it, and would get that in
right away—cash it in right away. I deposited
it the next morning at Sweetwater. * * *

"At no time while I was in the hospital did
the nurses or physicians talk settlement with
me. I talked with Mr. Hemus of the claim de-
partment about the settlement. When Mr. Mc-
Pillomey took my statement, I do not remember
that he discussed the settlement with me. I
saw other claim agents about the hospital, but
I don't think they ever did talk about settle-
ment with me. They would pass the time of
day; say something cheerful; that was all. I
think I saw Mr. Hamilton, the general claim
attorney, but never talked settlement with him;
my understanding was that Mr. Hemus was
handling the matter for Mr. Hamilton. I don't
know that the physicians and nurses, attend-
ants, and claim agents about the hospital con-
tinually reminded me that the defendants were
not legally liable to me for the injuries and were
not obligated to treat me; I have no recollection
of any such thing. As I have testified to this
jury, all Mr. Hemus said about the company
being liable was that it was not shown that it
was liable. Nothing was ever said at the time
I was in the hospital, or at any other time,
that the railroad company was treating me as
a matter of charity; this was not a charity case;
the hospital association deducted a certain
amount every month from my wages and that
entitled me to treatment, and no one has ever
questioned my right to treatment that I know
of; it was not questioned either by Mr. Jarrott,
when we made the settlement at McCauley, or
at any other time; my right to the hospital
treatment has never been questioned to my
knowledge.

"When I left there in August they told me to
come back, and I suppose I could have done so;
I was always treated kindly at the hospital, and
have no complaints to make. As well as I re-
member, the first time I left the hospital was in

February. They always gave me transportation for myself and family whenever I asked for it. When I left the hospital for the last time, Mr. Hemus said that the doctors had given me a release and he was not supposed to give me transportation, unless we made a settlement; that was the only time there was any question about giving me transportation. The first time I ever met Hemus was when I went to him in February to get my transportation. I think that was the time that he offered to settle for $1,500. At that time they had given me a discharge from the hospital, but I was not well. I still had the cast on my leg, and had to go on crutches. I believe my jaw was worse than it is now. I think it was swelled more. My arm was about as it is now; it was about well; there is still a metal cap on it, on the inside, I suppose, and covered up by flesh. I use the arm. When I left the hospital in February, Dr. Freeman told me I was all right, only needed to get out, but I knew I was not well then. I did say in answer to Mr. Gillespie's question: 'When I went to see Mr. Hemus in February, I told him that I was not satisfied that I was all right, and I did not want to make him any offer of settlement, but I would hear his offer—we had a right smart talk about it, and he finally offered me $1,500, and I told him I would not consider it at all, and he said I was dismissed from the hospital and was not supposed to have transportation without making a settlement, and I told him I would manage to get home some way, and he finally said they would give me transportation for myself and wife down there and give me transportation back, and that I could remain away 30 days.' I told him I was not ready to talk settlement; that I was not well yet."

J. E. Dunaway, witness for plaintiffs, and L. M. Dunaway, testified to the following conversation between himself and L. M. Dunaway immediately after the terms of settlement had been agreed to and before the contract had been signed:

"Luther came out meeting me as I walked up and he says—'Well,' he says, 'I have settled it,' and I says 'How much did you get?' And he says, 'I just got what they offered me, $3,750,' and I says to him, I says, 'How come you to settle? You told me you would not settle that way.' 'Well,' he says, 'my land in Mexico, I had to make proof on it and I did not have the money; it would cost me $40 or $50 to make the trip and to go out there, and I did not have the money to do that, and I was going to lose that,' and he says, 'My family is here on the bum, and I have been off 12 months, and winter time is coming on and I have no shelter and no clothing, and nothing, and I am not able to work,' and he says, 'I don't see how I could do without that 3 or 4 years or wait on that in the condition I am in, my financial condition is in such condition that I cannot wait for 5 years to get that.' We were within a few steps of the depot when Luther met me. Mr. Jarrott was around the depot somewhere. The next thing they went in and Luther signed the release and Mr. Jarrott gave him the check. I witnessed the release. Mr. Jarrott had told Luther during this conversation there at the hotel, he told Luther that if he made this settlement and taken this money, why he would not be having to live around on his kinfolks, and probably they were getting tired of him, during that conversation, by taking that money he would not have to live around on the bum among his kinfolks and them probably getting tired of him or probably would get tired of him."

[7] Jarrott denied emphatically that he made disparaging statements concerning any of defendant L. M. Dunaway's attorneys and further denied that L. M. Dunaway told him

that he had employed attorneys, but even if he did make the alleged misrepresentations concerning the services to be rendered by some of those attorneys, the same could not of themselves constitute a sufficient basis for rescission of the contract of settlement in view of all the testimony introduced to establish such a claim. Jarrott and L. M. Dunaway were dealing at arm's length. Jarrott did not sustain any fiduciary relation to Dunaway.

[8, 9] The arguments made by him as testified to by L. M. Dunaway and his father could not, under all the circumstances, be condemned as fraudulent or as amounting to undue influence, nor could the distressed financial circumstances of L. M. Dunaway, standing alone, furnish a sufficient basis for such a rescission. In Beeville v. Jones, 74 Tex. 148, 11 S. W. 1128, a deed to land was canceled by the trial court on the ground of mental weakness of the grantor and undue influence exercised upon her, and in that case our Supreme Court used the following language:

"If it be conceded that there was evidence authorizing the submission of the issue of imbecility or mental weakness upon the part of plaintiff of such character as would avoid the deed, there was no 'evidence of imposition or undue influence' accompanying it, and the charge was in this respect misleading. It is also otherwise defective. The utmost concession in behalf of plaintiff which the proof authorized was that she was 'naturally a weak-minded woman, but her mind was as good in the fall of 1879 as it ever was.' It cannot be legitimately inferred from the facts that her 'imbecility was of that character which rendered her incapable of understanding the deed,' as stated in the charge, and this was therefore unsupported by proof. The instruction was calculated to impress the jury with the belief that 'mere mental weakness accompanied by evidence of imposition and undue influence' would be sufficient to vacate the deed whether the evidence established these facts or not. 'Mere mental weakness' alone would not have that effect, and in this case there was no evidence whatever of imposition or undue influence. The mere fact of plaintiff's weakness of mind or old age would not incapacitate her from conveying her property. Stone v. Wilbern, 83 Ill. 107. In order to avoid a deed on the ground of undue influence it must be shown that the influence existed and was exercised for an undue and disadvantageous purpose. That the influence existed may be inferred from the relative or actual position of the parties. In the case of a gift from the child to the parent undue influence may be inferred from the relation itself, but never when the gift is from the parent to the child, and no suspicion whatever attaches to the latter. But there is no doubt that upon proof of the actual exercise of undue influence it may be set aside. The existence of undue influence and its exercise must concur to produce the effect of avoidance. Millican v. Millican, 24 Tex. 445. These elements were not developed by the proof, and the charge we think was error. That the plaintiff's advanced age and her weak understanding at the time of the execution of the conveyance may be considered in estimating the fairness of the transaction where there is evidence of imposition, overreaching, or fraud, we think there is no doubt. Millican v. Millican, supra. Such is not the case before us."

Defendants in error have cited several authorities, including Wells v. Houston, 23 Tex.

Civ. App. 629, 57 S. W. 584; Varner v. Carson, 59 Tex. 306; Pomeroy's Equity Jurisprudence, §§ 943, 944, 948, discussing the general principles governing the right of rescission of contracts, by reason of fraud in their procurement, but none of them, in our opinion, lead to a conclusion adverse to that reached by us and stated above. Each case of that character must be determined by its own peculiar facts, and, ordinarily, authorities upon that issue are pertinent to the extent only that they announce general principles of equity which control.

[10] Furthermore, assuming that the railway company was liable for the injuries sustained by Dunaway, and that $8,000, the amount of damages assessed therefor, was reasonable, yet in view of the fact that the issue of liability was doubtful, that by the settlement the delay and annoyance of perhaps protracted litigation was avoided, and the further fact that by the judgment rendered Dunaway was awarded only $1,850 in addition to the sum he had received in the settlement, there was no proof of such gross inadequacy of price paid for the settlement as of itself to constitute a badge of fraud practiced upon Dunaway.

In his cross-bill against the railway company L. M. Dunaway alleged that Bridwell negligently pulled the stake from its socket and negligently braced his feet against said load of timbers in such manner as to push the same in an outward direction, and that such acts of negligence, concurring with the unstable and top-heavy condition of said timbers which rendered them likely to fall when the stake was removed, caused them to fall, and that such negligence of Bridwell was the proximate cause of the injuries sustained by L. M. Dunaway. Substantially the same allegations were made by plaintiffs. The pleadings contained other allegations of negligence as the proximate cause of the injury, but as the same were not submitted to the jury and as no contention is made in appellee's briefs that there was sufficient evidence to support a verdict thereon in their favor, they will not be stated in this opinion.

Following are special issues submitted with the findings of the jury thereon, to wit:

"Ninth Special Issue: Did George Bridwell pull the stake holding the timbers on the car out of its socket at the time of the injury as alleged in said Dunaway's pleadings? A. Yes.

"Tenth Special Issue: If you have answered 'Yes' to the preceding question, then was the said Bridwell guilty of negligence in so pulling said stake? A. Yes.

"Eleventh Special Issue: If you have answered 'Yes' to each of the foregoing questions, then was the pulling out of said stake by said Bridwell the proximate cause of the injuries to the said Dunaway as alleged by him? A. Yes."

The issue of negligence of Bridwell so shown was the only issue of negligence submitted by the trial court to the jury, and the only one upon which the judgment against the railway company for $8,000 was predicated.

By appropriate assignments of error, it is insisted that the evidence was insufficient to support the jury's findings that Bridwell was guilty of negligence which was the proximate cause of L. M. Dunaway's injuries, that hence no case of liability for those injuries was established, and that for that reason alone the trial court should have instructed a verdict in favor of the railway company, as to all demands against it asserted by both Dunaway and the plaintiffs in the suit, as requested by the railway company.

[11] We are of opinion that those assignments should be sustained. The only evidence relied on to support the findings of the jury adversely to the railway company upon those issues was the testimony of L. M. Dunaway, himself, which was as follows:

"At the time I received my injury I was working in bridge gang as bridge carpenter; had been for about 2 or 3 months. I have worked for the Santa Fé for 8 or 9 years; have been section foreman and extra gang foreman. Mr. Allen was foreman of gang at time I was hurt. Claude Trimm, McCabe, Gay, and Bridwell were working in the gang at the time. It was 9:30 a. m. when I got hurt. I was unloading a flat car loaded with bridge material; the car had been brought from Avalon, New Mexico, that morning; about 4 or 5 miles from the place where I was hurt. Car was loaded with ties and other timber 3x10, and 18 feet long; they had been creosoted; I think there were about 40 pieces of this timber. They were stacked along the edge of the car in two stacks about 20 planks high, as well as I remember; the ties were over behind the timber and in between them; fixed on the side of the car with stakes drove down in them. There was a hand car on top of the timbers. * * * In unloading the car, Bridwell and me was working together, Trimm and McCabe. The heavy timbers was piled up on my and Bridwell's side of the car. We proceeded to throw off the ties, and I think we had tie plates also and material like that. When we got down to the timbers we pulled all the stakes out but one, and I told him I would loosen it up a little, and then I would get back and for him to pull the stake out, and then we would just roll these timbers off, just push them off. I told him not to touch the stake until I loosened it up and got back out of the way, and he says all right, and I took a shaker bar and hit the stake a lick or two to loosen it up and he—I seen him do it—seen him falling as he went back while I was looking at * * * I seen the stake go up in his hand, and he went right back with the stake in his hand and the timbers came right over on me. I think I had hit the stake two or three licks, I don't think more than two; I had loosened it just a little bit—just begun to slip a little bit; it was tight and I could see it slipping; see where it would give a little out of the pocket. A shaker bar is a little flat iron bar about an inch and a half wide, and a half an inch thick, with a socket on the end of it to put through the shaker to throw the grate—to shake the grate on an engine, the fire grate. It is about 18 inches or 2 feet long, and I should think it would weigh about 5 or 6 pounds; not more than that. We could not pull the stake out of the pocket; it was drove in too tight; both Mr. Bridwell and myself tried to pull it out. As well as I remember, there were 20 of those pieces of 3x-10x18 in a stack, and there were two stacks. * * * As well as I remember they extended about breast high above the lumber. * * * I did not use the shaker bar until I got to the

last stake; the others we pulled out. I don't remember whether there were three or four stakes we had gotten out; we had gotten all of them out except one about the center of the lumber. Bridwell and I tried to pull that one out; it was not touching the lumber anywhere. We stood up on top and tried to pull it out. I went and got the shaker bar myself, and stood on the ground to drive this stake out. * * * I told Bridwell not to touch the stake because I knew when it was pulled out his force would kick that timbers off with him on top; he would have fell backwards. The lumber would have rolled off, and he would have fallen backwards, with the lumber rolling down there. He was standing on top of the stacks, and if they had of gone down he would have gone with them; he would go back; I wanted him to leave the stake alone until I could get out of the way, and he said he would; I did not watch him."

He further testified that he did not see Bridwell pull the stake; that after hearing the warning, "Look out!" he looked up and saw him falling backwards on the timbers with the stake in his hand. He further testified that while in the hospital at Topeka, he gave a written statement to the effect that he did not see Bridwell pull the stake, but supposed he pulled it, and in which statement he further said:

"Bridwell told me he was not pulling on the stake, but he must have been or the timbers would not have rolled off as they did. The timbers that fell on me were piled straight up and down, and there was no carelessness in with these stringers,"

—and that that statement was correct. In that statement he further said he did not blame the company or the men for the accident, but on the witness stand he explained his meaning as follows:

"When I said in the statement that I did not blame the company or the men, I meant that the men did not do anything intentionally; that they were my friends and I did not blame them; that it was an accident and I did not feel sore at them."

Defendant introduced depositions of George Bridwell, who was working with Dunaway at the time of the accident, and who was the only witness to the accident, except Dunaway; the depositions having been taken in answer to direct interrogatories propounded by plaintiffs and cross-interrogatories by the Atchison, Topeka & Santa Fé Railway Company. He testified as follows:

"Q. Please state how said accident, if any, happened. A. Dunaway knocked the side stakes out of the pockets on the flat car, and as the timbers started to fall he started to run but could not get out of the cut where we were unloading. Fourteen pieces fell on Dunaway, and an arm, both shoulders, and his jaw was broken, and knocked some teeth out, also broke his leg. Q. At the time of said accident, if any, where was the foreman under whose direction said work was being done, with reference to you and the said Dunaway? A. The foreman was on the east side of the car, and me and Dunaway was on the west side. There was a plan between Dunaway and myself concerning the manner in which the work we were doing was—should be done. I was going to throw the timbers over the top of the stakes which held the timbers on the car, but Dunaway said to knock them out; he had a sledge hammer which he got from the engineer; I was to hold the stake when Dunaway knocked it out from the bottom. Q. If you have answered that there was a stake fastened on the side of the car for the purpose of holding bridge timbers on said car, which it was your duty to remove, please say exactly what you were to do in removing said stake from the side of said car, also where you were to be and where the said Dunaway was to be when said stake was to be removed. A. I was to be on top of the timbers, and Dunaway was on the ground by the side of the car. Q. Was you pulling on said stake when it came out of its socket? A. No, I was not pulling, I only had a hold of it. Q. If you said that the said Dunaway was under the car of timbers where their falling would probably injure him, please say whether or not you gave him any warning that you were pulling on said stake, in time for him to get out of the way of the falling timbers. A. I never gave him any warning, as I only had a hold of the stake and it came loose too quickly for me to warn him. Q. If you have answered that said timbers rolled off of said car and injured the said Dunaway, did you still have the stake in your hand after the timbers had fallen? A. No, sir; I did not. I was on the timbers that fell; I fell back across the car as I felt the timbers moving. Q. Is it not a fact that Dunaway knew, at the time, that as soon as said brace, stake, or standard was removed from the pocket in which it rested that there was great danger of the bridge timbers falling on him? A. I told him not to knock them out, as it was dangerous. Yes, sir; it is a fact that the bridge timbers that we were preparing to unload from the car were 'loaded all right, and so far as I know or could judge from the appearance of same there was no defect in the loading of the timbers of the car. At the time Dunaway was knocking the stake or standard out of the pocket of the car I was not pulling on the stake, but simply holding it, and the blow of the hammer knocked it clean out of my hands, as well as the stake was knocked out of the pocket, the timbers falling. I was not pulling on the stake as Dunaway aimed to loosen the stake, and I was not to pull it out. Ed Allen (foreman), Berry Gay, L. M. Dunaway, and myself, and I believe Bill Koouse, were present assisting in unloading the car of bridge timbers at the time of the accident. There were five in the gang. There were no specific instructions as to how we were to unload the car, other than that two were to work on each side of the car. Nobody told Dunaway to get a hammer, or me to get on top of the car. Ed Allen was foreman, and his only orders were to unload the timbers; but he did not say exactly how we was to do. Q. What, if any, understanding was had between you and Mr. Dunaway as to what he should do in the unloading of said car of bridge timbers, and what were you to do and how were you to do or perform the work assigned to you if any was assigned you therein? A. There was no specific plan which we was to follow in unloading the car. Dunaway suggested that he would knock the stake loose, and I stayed on top of the car and he got down and got a sledge hammer from the engineer and said that I would take the stakes out of the pockets when he loosened them; that we could do it easier than to throw the timbers over the side stakes."

[12] When one seeks to recover damages of another caused by his negligence, it is incumbent upon him to establish by competent proof not only the negligence alleged, but also that such negligence caused the injury. In T. & P. Ry. v. Shoemaker, 98 Tex. 456, 84 S. W. 1082, our Supreme Court said:

"This fact of causal connection between an alleged negligent act or omission and an injury can no more be presumed than can the act or

omission itself. Missouri Pac. Ry. Co. v. Porter, 73 Tex. 307, 11 S. W. 324; Texas & N. O. Ry. v. Crowder, 63 Tex. 505."

And in F. W. B. Ry. v. Jones, 106 Tex. 345, 166 S. W. 1130, our Supreme Court quoted with approval the following statement of a familiar rule:

"No inference of fact should be drawn from premises which are uncertain. Facts upon which an inference may legitimately rest must be established by direct evidence as if they were the facts in issue; one presumption cannot be based upon another presumption."

See, also, Mo. Pac. Ry. v. Porter, 73 Tex. 304, 11 S. W. 324; Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059; G. C. & S. F. Ry. Co. v. Davis, 161 S. W. 932.

The causal connection between the alleged act of Bridwell in pulling the stake and the accident was alleged in the pleadings of Dunaway as follows:

"That at the same time that said Bridwell gave said sudden pull or jerk that he carelessly and negligently braced his feet against said load of timbers in such manner as to push the same forward, and this action concurring with the unstable and top-heavy condition of said timbers as so loaded, and the sudden pulling out of said stake as aforesaid, caused said timbers to fall off said car and onto petitioner. * * * "

And it was further alleged:

"That on account of the manner in which said timbers were so loaded upon said car, it would be an easy matter for them to get top-heavy and fall off said car if said standards were removed."

Plaintiffs' pleadings contained substantially the same allegations.

[13, 14] As conclusively shown by the testimony of Dunaway quoted above, he did not see Bridwell pull the stake; his testimony being merely his conclusion or opinion that he did pull it, and that as a result of that act the timbers fell from the car. The decision of those issues was the exclusive province of the jury, and if that objection had been urged to the testimony, doubtless it would have been sustained. But it is well settled that a verdict cannot be sustained by incompetent testimony, even though it is admitted without objection. Henry v. Phillips, 105 Tex. 459, 151 S. W. 533.

It will be noted that Bridwell had testified by deposition, directly and repeatedly, that he did not pull the stake, but that Dunaway knocked it from its socket. Whether or not he did knock out the stake was within Dunaway's knowledge, and if he did not do so he could have so testified, but he did not so testify, unless his testimony that the timbers could not have fallen if Bridwell had not pulled the stake from its socket should be construed as equivalent to a direct statement that he (Dunaway) did not knock it from its socket.

[15] It is a familiar rule that a failure to produce evidence peculiarly within the knowledge of a party will raise a presumption against him, and every reasonable intendment will be in favor of his opponent upon

that issue. Mitchell v. Napier, 22 Tex. 120; Bailey v. Hicks, 16 Tex. 222; G. H. & S. A. Ry. v. Young, 45 Tex. Civ. App. 430, 100 S. W. 993; 16 Cyc. 1064. See, also, Skov v. Coffin, 137 S. W. 450; 16 Cyc. 1062. Without attempting to decide whether or not under that rule, the presumption could be indulged under the facts stated, that Dunaway did knock out the stake, as testified to by Bridwell, and construing his testimony that the timbers would not have fallen if Bridwell had not pulled the stake, as equivalent to a direct statement that he (Dunaway) did not knock it out, nevertheless the statement as made involves an inference that Bridwell pulled it, when Dunaway says himself he did not see him pull it, and based upon that inference involves the statement involves the further inference that in pulling it, Bridwell exerted an outward pressure upon the timbers with his feet, and the further inference that as a result of such pressure, and not their top-heavy condition, the timbers fell; Dunaway testifying further that the timbers were not touching the stake. Such proof was not legally sufficient to support the findings of the jury that the injury was the proximate result of Bridwell's alleged negligence, and the same was the only proof offered to sustain such findings.

From the foregoing conclusions upon the assignments of error discussed, it follows that the judgment in favor of plaintiffs and L. M. Dunaway against the railway company, rescinding the contract of settlement and allowing them the recoveries mentioned, must be reversed and judgment must be here rendered in favor of the plaintiff in error, the Atchison, Topeka & Santa Fé Railway Company, as to all of said demands; and it is so ordered. And in view of that disposition of the case it becomes unnecessary to notice other assignments presented in the brief of the railway company.

Reversed and rendered.

On Motion for Rehearing.

In our consideration of the case on original hearing we assumed as true the testimony of L. M. Dunaway, to the effect that at the time of the settlement of his claim with the railway company through its claim agent, Bowman Jarrott, said Jarrott made to Dunaway the disparaging statements relative to some of Dunaway's attorneys. We also assumed as a fact that those statements were false and intended to state in our original opinion that even the record upon the trial showed their falsity. And at the earnest insistence of counsel for appellees, we make the foregoing as a part of our original opinion.

Counsel for appellees have pointed out some inaccuracies in the recital of facts which are of no material importance, such as that Dr. W. F. Britton at the time he was called on to treat Dunaway in Putnam had

not seen the latter since his boyhood, citing evidence to show that he had in fact seen him much more recently than that. We shall not attempt to correct such minor errors, as to do so would lengthen the opinion, which perhaps has been extended unnecessarily already.

Plaintiffs in the court below also insist that the judgment rendered in their favor against L. M. Dunaway, as well as against the railway company, for $2,400, should have been left undisturbed since Dunaway has presented no complaint or contention, either in the trial court, or in this court, that such judgment should be reversed as to him also, if reversed as to the railway company.

It is apparent from the entire record that the judgment in favor of plaintiffs was for $2,400 of the amount awarded as compensation to Dunaway for his injuries over and above the amount he had already received, such excess being $4,250, or the difference between $3,750, the amount he had received, and $8,000, awarded by the jury as the total amount of damages sustained by him by reason of his injuries; and that the judgment in favor of plaintiffs against Dunaway, as well as against the railway company, was merely to preclude Dunaway from making any claim to that portion of such additional damages.

[16] In other words, it is apparent from the record that the recovery awarded to plaintiffs was conditioned upon the liability of the railway company at all for damages in excess of the amount already paid to Dunaway. Under such circumstances, a reversal in favor of the railway company operated as a reversal of the entire judgment. Acklin v. Paschal, 48 Tex. 147; Washington v. Johnson, 34 S. W. 1041; Hamilton v. Prescott, 73 Tex. 565, 11 S. W. 548, and decisions therein cited; Thompson v. Kelley, 100 Tex. 536, 101 S. W. 1074.

[17] Furthermore, the fact that Dunaway has filed no reply to plaintiffs' contention that the judgment against him for $2,400 should be undisturbed, or that they should now have a judgment for at least a part of the $3,750 received by Dunaway, in addition to other circumstances shown in the record, indicates that, in reality, probably they are not hostile to each other upon those issues.

Plaintiffs insist further that, even though the judgment be reversed in its entirety and here rendered in favor of the railway company, still, at all events, we should further render judgment in their favor against Dunaway for three-tenths of $3,750, the amount received by him in the compromise settlement with the railway company, under the undisputed contract they had with Dunaway. The contract of employment of plaintiffs by Dunaway was in writing and did assign to plaintiff three-tenths of the cause of action against the railway company, but following the language evidencing such assignment it stipulates:

"It is further agreed and understood that in case a compromise is made of the said claim before any suit is filed thereon, then my said attorneys are to receive an interest equivalent to 15 per cent. of the amount agreed on as compromise, instead of the three-tenths interest above mentioned."

It is also undisputed that the compromise settlement was made prior to the filing of any suit on the claim for damages.

Under those circumstances, we will now here render judgment in favor of plaintiffs against defendant L. M. Dunaway for $562.-50, same being 15 per cent. of $3,750, with interest thereon at the rate of 6 per cent. per annum from November 11, 1913, the date of the settlement.

Accordingly, the judgment heretofore rendered by us is so reformed as to give plaintiffs a judgment against Dunaway to that extent, but in all other respects it is undisturbed.

Subject to the foregoing, the motions for rehearing filed by plaintiffs and by defendant L. M. Dunaway are overruled.