# MARYLAND CASUALTY CO. v. SLEDGE.
## No. 2178.

Court of Civil Appeals of Texas. Beaumont.
Jan. 27, 1932.

Rehearing Denied Feb. 17, 1932.

Smith, Smith, Huffman & Boyd, of Beaumont, for appellant.

McCall & Vaughn, of Beaumont, for appellee.

WALKER, J.

This was an action under the Workmen's Compensation Act (Rev. St. 1925, arts. 8306 to 8309, amended to 1930) by appellee against appellant, in the nature of an appeal from a final award of the Industrial Accident Board, to recover compensation as for total and permanent disability. The allegations of the petition and the nature of appellant's answer will be reflected by the discussion of the assignments of error. The jury found that appellee was injured on or about the 23d day of April, 1930, in the course of his employment with W. C. Wells in Beaumont, Jefferson county, Tex., which injuries resulted in his total permanent incapacity. The jury found further that appellee's injury was the sole cause of his "disability to work and earn money," and that manifest hardship and injustice would result to him if appellant failed to redeem its liability to him in a lump sum settlement. The jury further found that at the time of the trial appellee was not suffering from "injury and the effect and consequences of injuries to the fourth lumbar vertebra." On the jury findings the court entered judgment upon additional findings made by him to the effect that appellee's average weekly wage was $28 under section 1, subd. 3, of article 8309 (Rev. St.), and on his independent finding, together with the jury's verdict, allowed appellee compensation in a lump sum at the rate of $16.80 per week for a period of 401 weeks, making a total recovery of $5,121.57.

Appellant has not submitted propositions of law in its brief, but has related its arguments to the several assignments of error, fifteen in number. By the first, second, third, and fourth assignments of error the point is made that "the evidence wholly fails to show any permanent injury to plaintiff's first lumbar vertebra and the muscles and ligaments of his back." In alleging his injuries, appellee pleaded the facts of the accident, and that it resulted in "fracturing first lumbar vertebra and the muscles and ligaments of his back were bruised, sprained and torn and as a result of which the plaintiff now has to wear a brace; that his legs, arms and hands have become permanently paralyzed from said injury." On the extent of the disability resulting to him from his injuries, appellee testified:

"I have suffered some paralysis on account of that injury; of a morning when I get up, ever since this brace was put on me and the doctor let me up, of a morning when I get up my legs from my hips down are numb; and it generally takes from about nine till eleven o'clock before it goes plumb out of my legs. Of a night when I get to bed, it feels pretty good, but when I get up of a morning, my legs are plumb numb, and it has got to where when I catch hold of anything and squeeze it tight, I have to take my other hand and break my fingers loose from it. I never was that way before in my life.

"The place in my back where I suffered from the injury is right back there (indicating). It just seems like all the time when I am up, going around, there is somebody taking a knife and just shoving in and prizing the joints in my back apart, or something; it just hurts and aches all the time. I am not able to do any work now. I am not an educated man. I never went any higher than the fourth grade in my life."

"I was in that body cast for three months. When he took the long cast off of me, from my ankle up to here under my arms, why, then for about two or three months I wore a cast from my waist up here. That's when he started letting me walk around, and before my brace got here. That was from my hips to my arm pits. As to whether I have ever tried to do anything without my brace, I will say that of a night several times when I get in the bed I take that brace off and catch myself and try to hold myself up, and it would just hurt so bad until I couldn't do it; I had to lie back down. I never do get up without putting that brace on. I set it by my bed and every morning before I get up I slip it under me and pull it up and then I can get up and go around. That is the only time I have experimented with removing the brace and working without my brace. Dr. Hart told me that I might eventually get all right, but he said that I would have to wear that brace, and that some time I might get able to go without it, but he didn't know."

"Since I got up I have just been staying around home, in bed a good part of the time, because my back feels better when I am laying down than it does when I am up, going around, and if I go around too much in the day and walk around, up on my feet all day, of a night it hurts me so bad I can't rest, and so I stay around home in the bed mighty near all the time. I have not attempted to do any work of any sort. I don't think I could run a truck now, because when I am in a car, if they hit a kind of a bad road—coming out of my house it is a dirt road for about a hundred yards to the highway, and when I am coming over that dirt road, the jar of that road hurts my back, and I know that I couldn't stand to sit on a rough truck, because just the jar of a passenger car hurts my back. I don't believe that by massaging and easy work, and prudent massage of my back that finally I would be restored to normal condition; I ain't going to say definitely, but I don't believe so, because every night

whenever I get in bed and take off my brace my wife takes this Alcorub that Dr. Hart told her to use and rubs my back, and she rubs it sometimes 30 minutes at a time and it don't seem to help it any. That would be for the muscles and the ligaments."

Dr. E. T. Miller, the witness for appellee, testified as to the extent of appellee's injury as follows: "It is reasonable to suppose in an injury of that kind the ligaments were all torn, and lacerated, and broken. The backbone is held in place by tendons and ligaments. If a lick is sufficient to break the bone, it would bruise the muscles and break, lacerate, and tear, the ligaments which hold the bones in place. As to the effect on a man of an injury such as Sledge received insofar as his being able to get out and do manual labor, I don't think he will ever be able to do any manual labor again. I don't think that a break of one of those vertebrae can be patched up in such a way that a man is normal. He has got a little infected process there now in one of those bones which will have to be curetted out before he will ever get well. There is a little hole there where the pus is coming out through the skin. You don't have to have an X-ray to see that. In other words, it is something like a fistula from the lower part of the bowels, the rectum. I cannot recall any injury to a back such as Sledge has received, where there has ever been a permanent cure effected. I don't think he can be cured permanently. The injury that he has is not likely to give away at any time and cause instant death or paralysis, but if that infection should travel into the spinal cord, it might cause very serious trouble. If he complains about paralysis on waking up in the mornings, that his legs are numb and that that usually lasts from nine to ten or eleven o'clock, that is no doubt caused by pressure by one of the vertebrae on the spinal cord. At every joint of the backbone there are nerves coming out from the spinal cord and going to various parts of the body. If those nerves become impinged that naturally results in some disorder to the body somewhere. In the place where Sledge's back was broken the nerve which comes out of that particular place is the nerves which supply the muscles of the legs. That is the reason for the numbness and tingling and burning sensation."

Dr. John A. Hart, a witness for the defendant, upon cross-examination upon said issue, testified as follows: "The injury that he received is a serious one. I think he has recovered. I wouldn't say positively that a man has ever recovered from influenza; but as far as I know he should be completely recovered. Sure, he would be the best one in the world to know about that. He should be in a better position to say whether or not he has recovered than any one else. I have not

seen Mr. Sledge since January 15th, and have no basis for an opinion as to whether he could get out here and handle a truck, and handle pipe and stuff like that."

This evidence raised the issue, and was sufficient to sustain the verdict of the jury, of total permanent disability. Our construction of this evidence on this issue has full support in the opinion of the Commission of Appeals in Standard Accident Ins. Co. v. Williams, 14 S.W.(2d) 1015, 1016, where it was said:

"The plaintiff testified: 'I have been under the care of a physician the last few months all the time; under the care of Dr. Anderson and Dr. Johnson. I do not know what it is they give me. It is something to ease me so that I can sleep. It hurts in here, this leader drawing in the elbow, right here. It hurts just like a rheumatic pain. * * * Since the date of my injury I have not earned any money at all—practically nothing at all. I have not been able to do anything. I have attempted to work since I got hurt. Mr. Underhill told me he would get me a job, watching, night watching, and I undertook to do that. I just got $12.00 a week and I could not do any good at it and my arm hurt so bad working at night I had to get out.'

"A doctor testified for the plaintiff: 'It has been over a year and it doesn't get better. The condition I have described here would lessen the sense of touch. * * * It seems about a year since I first examined his arm and shoulder. I couldn't say for sure. I think the arm is in about the same condition as it was when I first saw it, possibly a little worse. * * * From the condition I find that arm in, my opinion is he will suffer pain.'

"From this testimony we cannot say that reasonable minds could not find that the plaintiff's injuries were permanent and totally disabled him from performing his customary work as a painter and paper hanger. There was therefore no error in submitting the issue, neither was there error in refusing to set aside the verdict thereon."

In controverting appellee's claim of total permanent disability, appellant offered testimony by several physicians of integrity and ability to the effect that appellee's injuries were not total and not permanent. This evidence merely raised an issue against the claims of appellee, and the verdict of the jury resolving this issue in appellee's favor is binding upon this court.

Appellant further insists that the excerpt from the testimony of Dr. Miller given above should not be given any probative force as opinion testimony, because appellant says that this witness testified to facts refuting his opinion, as thus stated. We do not so construe the testimony of this witness. But

445

even if there is a discrepancy or conflict in his testimony, its weight was for the jury.

In Insurance Ass'n v. Herron (Tex. Civ. App.) 29 S.W.(2d) 524, 527, the court said: "Inconsistencies and contradictions in Mrs. Arrendiell's testimony merely raised questions of fact for the jury. Funk v. Miller (Tex. Civ. App.) 142 S. W. 24, 25, par. 1; Melburn v. Webb (Tex. Civ. App.) 277 S. W. 800, 801; Davis v. Petroleum Casualty Co. (Tex. Civ. App.) 13 S.W.(2d) 981, 983; Farmers' Gin Co. v. Smith (Tex. Civ. App.) 28 S. W.(2d) 839."

Appellant correctly contends that appellee should not have been permitted to testify that his injuries were total and permanent. The point is not that such evidence by appellee was wrongfully received, because it was not objected to, but that, having been received, it was without probative force. Railway Co. v. Smith (Tex. Civ. App.) 190 S. W. 761, supports the proposition that such testimony would not support the verdict. On this proposition, see, also, Johnson v. Gattegno (Tex. Civ. App.) 267 S. W. 740; Henry v. Phillips, 105 Tex. 459. 151 S. W. 533; Moody v. Rowland, 100 Tex. 363, 99 S. W. 1112; Bishop v. Millers' Indemnity Underwriters (Tex. Civ. App.) 254 S. W. 411. But this proposition does not constitute reversible error because the verdict has abundant support in appellee's description of his injuries and suffering and the disability resulting therefrom and in the testimony of Drs. Miller and Hart, as copied above, independent of anything he may have said about his injuries being permanent. But it should be said of Dr. Hart that his testimony, as a whole, was adverse to appellee's contentions, and that in the judgment of this witness appellee had not suffered total permanent disability.

Appellant is correct in its contention that, as appellee "alleged specific injuries to specific portions of his body, he is limited to such injuries, and that if he is permitted to recover at all it must be for injuries specifically alleged in his petition, and further that such injuries must be to the specific portions of the back as plead." There was evidence to the effect that appellee's "fourth lumbar vertebra" was injured and also that subsequent to his injury he suffered an operation for appendicitis. There was no objection brought forward in the record against the testimony relating to the appendicitis operation. The contention is made that "the jury was not limited in its finding to injuries received by plaintiff to his first lumbar verbetra and the muscles and ligaments of his back." The answer to this proposition is that the jury was charged by the court, at appellant's request, in an affirmative way, to limit its findings in accordance with this proposition. On this issue the following charge was given: "You

are instructed at the request of the defendant that in arriving at your answers to the special issues submitted to you in this case, you will not consider for any purpose whatever the appendicitis and its effect suffered by the plaintiff, nor consider for any purpose any injury, if any, of any nature or to any extent to the fourth lumbar vertebrae, but will confine yourselves to consideration of the injury alleged in the plaintiff's second amended original petition, that is to say, the fracture of the first lumbar vertebrae, and the bruising, spraining and tearing of the muscles and ligaments of his back, if any, in connection with said injury." Also, at appellant's request, the court submitted to the jury the following issue, which was answered in the negative: "Is the plaintiff, J. R. Sledge, suffering at this time from injury and the effects and consequences of injury to the fourth lumbar vertebrae?" These charges clearly limited the jury, in answering the special issues, to the evidence admissible under appellee's pleading.

It has been held that the court, in submitting the issue of lump sum settlement, did not err by refusing to define the term "manifest hardship and injustice." In Insurance Ass'n v. Herron, supra, the court said, on this proposition: "Appellant complains of the action of the court in submitting over its objection special issue No. 7, in response to which the jury found that manifest hardship and injustice will result to appellees if their compensation is not paid in a lump sum. The ground of objection was that the term 'manifest hardship and injustice' was a legal term, and that the court should have defined the same so as to enable the jury to intelligently answer such issue. Appellant cites no authority in support of such complaint. The Court of Civil Appeals for the Sixth district, in Texas Employers' Insurance Ass'n v. Brock, 26 S.W.(2d) 322, 324. par. 5, held that the words 'manifest hardship and injustice' were words in common use, and that it should be assumed the jury knew the meaning of the same as well as the court knew it. See, in this connection, Texas Employers' Insurance Ass'n v. Lovett (Tex. Civ. App.) 19 S.W.(2d) 397, 400, par. 9. Appellant's objection to the submission of said issue on the ground stated was properly overruled."

We think the following testimony by appellee was sufficient to raise the issue of lump sum payment: "Since I have been injured I have contracted indebtedness; my grocery bill and my clothes for me and my wife and baby, and everything, has run up to about $800.00. If I were to receive the compensation in weekly payments I would not be in a position to pay off that indebtedness and live. I can't live on the compensation I was getting to save my life, because my bills run about $50.00 a month. I am not capable

of doing anything. I was raised in Oklahoma, in the country. I am an experienced farmer. I figure if the insurance company were to be required to redeem its liability to me, if any, that I could take that and handle it carefully and judicially and make an investment that would take care of me; and that is what I want to do. I would take the money that I could get and buy me a place, to where my wife could have some chickens and things that she could take care of, to help us have a living. I think I could do that; that's what I would do."

■ The issue of appellee's average weekly wage was not submitted to the jury, but determined by the court as follows: "It appearing to the court that the plaintiff's weekly wage cannot be ascertained and computed as provided by Subdivisions Nos. 1 and 2, of Article 8309, of the Revised Civil Statutes, and that the plaintiff herein is entitled to have his average weekly wage ascertained and determined under Subdivision No. 3, and the court finds that the average weekly wage of plaintiff, J. R. Sledge, is the rate of $28.00 per week, and that said sum is fair and just to both the plaintiff and defendant, and that the plaintiff herein is entitled to recover of and from the defendant compensation at the rate of $16.30 per week for a period of 401 weeks."

Appellee duly pleaded all three subdivisions of section 1 of article 8309. The following testimony was offered by him on this issue: "My name is J. R. Sledge. I live at Vidor, Texas, am 26 years old, and married and have one baby. On the 23rd day of April, 1930, I was working for W. C. Wells in the capacity of a truck driver at Beaumont. I was making $3.50 a day, working 7 days a week. I would also make overtime. I had been employed by Mr. Wells about 30 days, and I guess I had made about 12 or 15 hours' overtime during that period. I received 30 cents an hour for overtime."

H. C. Alewine, a witness who had been employed by W. C. Wells for a period of more than a year, testified as follows: "My name is H. C. Alewine. I live at 1357 Laurel. I work for W. C. Wells, and have been working for him right around two years. I remember when Robert Sledge got hurt there, but I wasn't there at the time. I drive a truck. I was working in the same capacity, in the same line of work as Sledge, and had been there a year previous to the time that Sledge got hurt. I was receiving wages of 30 cents an hour. I averaged about 12 hours a day; sometimes worked all night. I worked seven days a week. Along about the time Sledge got hurt and for the year previous to that time I was getting about $30.00 a week; it averaged about $28.00."

Under Barron v. Ins. Ass'n (Tex. Com. App.) 36 S.W.(2d) 464, 468, as this issue was not submitted to the jury, the court was authorized to make a finding thereon. The point is not made that the court erred in refusing to submit the issue to the jury, but only that his finding is without support. In this appellant erroneously construes the testimony. We think that the issue, under section 1, subd. 1, was not raised, but was raised and established as a matter of law under section 1, subd. 2, and therefore that there is no basis for the court finding this issue under section 1, subd. 3. Under section 1, subd. 2, appellee pleaded his average weekly wage in the sum of $24.50 per week. The evidence was sufficient to sustain the court's finding of $28, but, of course, the court could not extend his finding beyond the amount pleaded. It follows that the judgment of the court fixing the average weekly wage at $28 must be reformed and fixed at the sum of $24.50, under which appellee would be entitled to compensation of 60 per cent. of $24.50 for 401 weeks, and in this respect the judgment of the lower court is reversed and judgment here rendered for appellee in the sum stated, with instructions to the clerk to make the proper calculation under this finding.

■ On the trial of this cause appellee asked Dr. Hart the following question: "Now I'll ask you to look at this picture Doctor, and see if the picture doesn't show a break or fracture of that process around the fourth lumbar region?" This testimony was objected to upon the ground "that there was no allegation in the pleadings of injury other than to the first verbetra." The objection was overruled, and the witness answered as follows: "This right—I suppose it is the right—right transverse process of the fourth lumbar vertebra looks like there has possibly been a fracture there."

The following qualification by the trial judge relieved this assignment of error: "Dr. Hart was witness for the defendant. He testified that he treated the plaintiff, J. R. Sledge, during all the times mentioned in plaintiff's petition, and testified that his injuries were confined to the first lumbar vertebrae, and the said witness was upon cross examination, asked said question and the answers were permitted for the purpose of impeaching the witness' testimony and for the further purpose of showing that the doctor was not fully cognizant of all the injuries suffered by the plaintiff."

There being no error in the record except upon the calculation of appellee's average weekly wage, it is ordered that the judgment of the lower court be reformed in that respect, as above indicated, and, as reformed, affirmed.