## INDEMNITY INS. CO. OF NORTH AMERICA v. BAILEY.

### No. 2141.

Court of Civil Appeals of Texas. Beaumont.
April 21, 1932.

Rehearing Denied June 8, 1932.

Barnes & Barnes, of Beaumont, for appellant.

Elton Cruse and Howth, Adams & Hart, all of Beaumont, for appellee.

WALKER, J.

This suit was filed in district court of Jefferson county by appellee, W. D. Bailey, against appellant, Indemnity Insurance Company of North America, in the nature of an appeal from an adverse award of the Industrial Accident Board. Appellee alleged that on March 4, 1930, he was an employee of the Gulf Refining Company of Port Arthur; that his employer carried its workmen's compensation insurance with appellant, as insurer; that on the date mentioned he received serious personal injuries resulting in his total permanent incapacity; and generally he pleaded the essential jurisdictional facts necessary in an action to recover compensation under the Workmen's Compensation Act (Rev. St. 1925, arts. 8306–8309, as amended). He also prayed for a lump sum settlement. Appellant's answer consisted of general and special demurrers and certain special defenses not involved in this appeal. Upon trial to a jury, it was found that appellee suffered total and permanent incapacity as the consequence of the alleged injuries, that his average weekly wage was $34.66, and that he was entitled to a lump sum settlement.

Appellant asserts that the finding of total and permanent incapacity was without any support in the evidence, and also that it was so against the great weight and preponderance of the evidence as to be clearly wrong. On this issue, we quote as follows from the testimony of the witnesses. Appellee himself testified:

"My name is W. D. Bailey. I live at Pear Ridge. On or about March 4 of 1930 I was living at Pear Ridge. I was working then at the Gulf Refining Company at Port Arthur, Texas. I did receive an injury while working for the Gulf Refining Co. at Port Arthur Texas on or about March 4 of 1930. On March 4, 1930, about 5:40 in the afternoon I received an injury from falling where I was working in a ditch. I had been called out of this ditch by Mr. Joe Goodale the job foreman, to assist some laborers in driving some sheet piling at the end of another ditch where they had been working, about three of them, I believe, nearly all day. I called his attention to it and he called me out and told me to go ahead and direct this work and drive that piling; I did so, and I went up to Red Kelso and a couple more laborers, and we stepped out to one side and got a six by six about 20 feet long, brought that up and laid it down, to drive this piling by the side of it. That was a shoulder to catch the piling. That was getting right along, by the time we finished this little job there, it was getting right along about quitting time, and I had left my tools in the bottom of this ditch, and most near all of them was quitting or going to the carpenters' shack. I believe all the carpenters by that time what wasn't already at the shack was slipping so they could get there mighty quick when the whistle blowed. Yet I was there and remained there, getting this work through. My attention was called to the time, it being close to quitting time, and as a usual thing we bunched up there about three or four minutes before quitting time, and get the mud off our shoes or boots, and so were ready at quitting time. On the day before this I had gone to the first aid 'with a finger that I had mashed the end of it about half off. I believe you can see a scar around it yet; and this hand right here you can see another scar that I had knocked a good piece of hide off by getting a ——— out of a concrete wall. I had been to the first aid and had both of those hands done up, and they were both pretty sore the next day. And when I started back into this ditch after my tools, there was some—the spreaders that we put across there was I suppose about that far (indicating) apart; and when I put my hands on them like that (indicating) to let myself down in the ditch my hands slipped off; naturally being sore they slipped off and I dropped the full depth of this ditch, striking a piece of one by eight or something; I don't remember the dimensions, but there was a piece of shiplap that the laborers kept down there to stand on in the bottom of the ditch to keep from bogging; lots of places down there if you stepped off the board you very near had to have help to get out. My feet

slipped from under me and I fell sort of back to the wall. I felt a, slight sting. One of the laborers asked me if I needed some help. He asked me first, 'Mr. Bailey are you hurt much?' and I said, 'I don't know if I am hurt much or not.' He said, 'You need some help to get out?' I said, 'I believe so.' He picked up my tools and threw them out on the bank for me, and got out himself and helped me up on the bank. And by that time, I believe myself then and those two negroes were really all that were right there; nearly everybody else was gone. I stooped down to pick up a little stick to rake the mud off my boots, and when I started to raise up, then is when I knew I was sure enough hurt, because I didn't get but about half up and a catch caught me then.

" * * * I fell the whole distance of the ditch, because when I started to take myself off of the bank up here, put my hands up there and it gave away, that let me drop the full distance. The ditch was about six feet wide at that point. My feet hit on a board in the bottom of the ditch. The board was slippery and muddy. My feet slipped out from under me; I fell in a little slant like that (indicating), and my feet slipped out from under me, and I fell backwards.

" * * * I have suffered pain with that condition ever since these injuries. The pain strikes me mostly right across my back in here (indicating) and then up sort of each side of my back, like, plumb across here (indicating). It does not pain me all the time. Of course, I have some times at ease, when I get set down in a certain position where that I get steady or maybe standing up and get steady, or lying down sometimes I get in a position lying down, and it don't pain me all the time. My main pain is when I am going about or trying to move, to stoop over, turn or twist around any way at all; then there is quite a soreness gets in me, all in here (indicating), and then when I make any kind of a move, any disposition to do anything at all—well, I have been miserable all this week. I believe I have been suffering more than I have any time because I have been driving back and forth from here to Port Arthur all that time, and there is a few rough holes in the road, and just these little jolts shaking me around, it hurts me. I hurt all the time. I learned a long time ago there wasn't any use in crying, and I get all that, and just take it all and go along with it. I would have to say that practically the whole of my body seems to have been affected by that injury I received on March 4. I am affected all over from the injury. My back, of course, being the worse of it, and was the main place that was hurt in the start, but I am affected considerably all over. Next to my back I notice it in my legs, both of them. Next to the legs, is my general body system. * * * The work of a carpenter calls for physical strength and muscular effort. You have to do lifting in the work of a carpenter at the Gulf Refining Company. There is heavy lifting connected with that. Before the time of my injury on March 4, 1930, I was able to do my work as a carpenter.

" * * * Before March 4, 1930, I was able to do the work of a carpenter. Since that time I have not been able to do the work of a carpenter nor any other kind of work. I haven't done any work since then. I have tried to hoe a little bit in the garden once in a while, and I haven't had any success at that."

Lee James, a witness for appellee, testified:

"My name is Lee James. R. L. James is the way I sign it. I know the plaintiff, W. D. Bailey. I knew him on or about March 4, 1930. It would be hard for me to say how long I had been knowing him before that, because I have been knowing him a pretty good while. On or about March 4, 1930, I was working at the Gulf Refinery, No. 3 gas plant, at Port Arthur, Texas. I was in the labor department, pushing a gang of laborers. I was foreman of my department. I know that Mr. Bailey received an injury on that date; he fell in in this ditch. That ditch was about six feet wide and supposed to go 12 feet deep, and we had it anywhere from six to 12 feet, a hundred feet long, and sheet piling driven around the side of it to keep the mud from coming in as we dug deeper, and Mr. Bailey was putting spreaders across there to keep the sheet piling from coming in.

"I saw Mr. Bailey when he fell into the ditch. * * * On this occasion Mr. Bailey had come out of the ditch for something and went after some lumber, I suppose to make these spreaders out of. I had just got through making out my time for the day's work, and so it was about two minutes or maybe four, before the whistle blew for quitting time, and I told Mr. Bailey he had better get the mud off his boots and get his tools together, it was just about quitting time. And so he started down in the ditch. He had a hand saw and a crow bar and a hammer; and he started to get in this ditch to get his tools. When he did, he put his hands like that on some timber (indicating); it was muddy there and when he put his hands down and started his feet down, he slipped; and into the ditch he went.

" * * * The tools for which Mr. Bailey was going were his tools in the bottom of the ditch. I didn't say if he went in the ditch on his feet or not. The last time I saw him his head was up, and he was going down into the bottom of the ditch, with his feet down and his head up. The ditch was anywhere from six to twelve feet deep. I said that at that point it was over six feet deep.

" * * * I had seen Mr. Bailey both before and after his injury, or before and after

the time he slipped into the ditch. It was necessary for us to have some carpenters to help in the construction of this ditch. It is a fact that before the time he slipped in the ditch he was an able-bodied man, able to do heavy work. Since he slipped into the ditch I have not seen Mr. Bailey do heavy work."

Dr. C. D. Coffin, a witness called by appellee, testified as follows:

"My name is Dr. C. D. Coffin. I am a chiropractor. I have examined W. D. Bailey. I have been practicing my profession nine and one-half years at Port Arthur. It was along about the last of April or the first of May of this year that I examined Mr. Bailey. My examination was of the spine. I am familiar with anatomy. I studied the anatomy of the human system in school. I have been dealing with that since I have been out of school in my practice for nine and a half years. I know the anatomy of man. On my examination of Mr. Bailey I found he had a rotation in the lower part of his spine. His spine is curved off of its main axis.

"I found something else abnormal about this man. I believe it was between the second and third lumbar vertebrae; the third is anterior producing a pressure on the spinal column, as well as in the rotation; there is pressure on the nerves. That has the effect of causing pain. I am familiar with the nervous system of human beings and I know the effect of an injury to the spine and nervous system of a human being. The condition that I found there is such that a man wouldn't be able to do any kind of hard work, due to pressure on the nerve. I refer to any kind of hard work or labor where there would be any lifting. I am familiar with the duties of a carpenter as usually performed. Carpenter work would increase the pressure on the nerve that is already there and on the spinal cord, to where the man would not be able to go ahead because the more lifting he had to do, the more pressure he would put on the nerve and on the spinal cord. He couldn't do any amount of any kind of work involved in the usual duties of a workman calling for constant activity and exertion. By any amount I mean that if he did any work it would have to be very light work because he would not be able to do any lifting of any kind since that would increase the curvature of his spine. The work he could do, if any, would be to have something very light. He might sell insurance or real estate or something like that where he wasn't required to do any lifting of any kind. He could not do any kind of work that required physical exertion or putting forth strength in his arms and legs. Unless his condition is corrected his injury will be permanent.

"I will say there is about a fifty-fifty break as to the probability of a cure. I think he might possibly receive some benefits from about a year's treatment. That is my opinion, I don't say whether the treatment, if successful, would result in his complete cure or partial cure."

Dr. Ledbetter, called as a witness by appellant, testified as follows:

"The toxic condition alone will sometimes produce the spur formation, but not in just one particular vertebra, but usually when one vertebra is involved it is produced by the joint result of the injury and the toxic condition.

"I don't know whether that fall would be a producing or efficient producing cause of the injury and consequent disability. The traumatic injury coupled with this old bony growth will produce inflammation and the inflammation will produce pain that will disable a man from work.

"If the man fell in the way that has been pointed out to me, that bone which I found partly healed could have been broken in that fall.

"It is my opinion that that fall could have produced the injury and incapacity, I guess. It would be the exciting cause or producing cause.

"If he was able to work after the first fall and did work about eight months without any pain and then fell again and he suffered pain after that and has suffered since, then it would appear that the second fall was the disabling injury."

Dr. John Gardner, a witness for appellant, testified that, in his judgment, appellee's condition was the result of an arthritis which was caused by "some foci of infection or chronic intoxication"; that he found "foci infection in the teeth and tonsils; also probably in the gall bladder." On cross-examination he testified:

"It is not my idea that necessarily if this man's teeth were removed and his tonsils removed and his testicle removed he would get well. He might and he might not. It is not necessarily true that when there is a cause for trouble, that if you remove the cause the trouble vanishes. That is not generally true in this type. It is not necessarily true that there is no cure for him; there may be and there may not be. We cannot say whether it is possible for him to be cured or not. Sometimes they spontaneously clear up and at other times they won't clear up under any conditions. These things that take years to produce may just spontaneously pass away. I didn't say that this bony growth might spontaneously disappear; I said the arthritic condition; the inflammatory condition. There may even be absorption of the bony condition. I mean to say they may have these bony growths, these spurs on the spine without the inflammation. I say the inflammation may disappear and this bony growth remain. It is not necessarily true that he has still got the

**488**

inflammation. I can't say whether Mr. Bailey has any inflammatory condition in that at this time or not. We can't say whether there was any inflammatory condition there at the time I examined him or not. If he is suffering pain he may have an inflammation there. I'am not able to say he doesn't suffer pain. I am not able to say that the inflammation doesn't exist. There is no way I can determine. The x-ray doesn't show whether it is inflamed or not. That is one of the many things the x-ray doesn't show.

"Assuming that this growth had been going on for years necessary to produce this condition of the spine I have testified about, and that he was able to do a man's work all the time, uncomplaining, without pain, heavy manual labor, working ten hours a day, and he had this fall and immediately after the fall he became disabled and suffered great pain, and has ever since, I think the fall might have had something to do with his condition. I don't know whether it did or not. If what he says is true, it may have. If he has been having severe pain and been disabled since that time, then we might assume that the fall flared up the condition. This bony condition wouldn't hurt him without a pain, and the fall might produce the pain. It all depends on how bad a man falls. If he had a fall which was severe enough, it would produce the pain. If the pain exists and is severe enough, he can't work. It is true that a man can't do things if it causes him severe pain. That pain, if it is severe enough, would incapacitate him to work. I don't know whether it exists or not. Whether the fall would in all probability produce the pain, all depends upon how severe the fall was. If he had a severe fall, he might have injured himself enough to produce the pain."

Dr. Matlock, a witness for appellee, testified: "An injury to the back such as might be received in a fall could easily produce the condition which I found as shown by the x-ray pictures."

■We think the evidence, as quoted, was sufficient to raise the issue of total and permanent incapacity and, under the authorities construing the evidence on this issue, to support the jury's finding thereon in appellee's favor. Inferences to be drawn from evidence of this character were stated clearly by the Commission of Appeals in Standard Accident Ins. Co. v. Williams (Tex. Com. App.) 14 S.W. (2d) 1015, cited by us in Maryland Casualty Co. v. Sledge (Tex. Civ. App.) 46 S.W.(2d) 442. Speaking for this court in New Amsterdam Casualty Co. v. Crow (Tex. Civ. App.) 16 S.W. (2d) 560, Mr. Justice O'Quinn said that evidence by appellee to the effect that he was unable to work, that when he tried to work his leg caused him constant and severe pain, that he suffered with swelling in the leg which did not subside as long as he worked, that

the leg felt as if the bone was broken, supported by expert testimony to the effect that the bone and its covering might have been injured, causing the condition of which appellee complained, supported a finding of permanent partial disability. In Security Union Casualty Co. v. Frederick (Tex. Civ. App.) 295 S. W. 301, 303, where the expert testimony was to the effect that symptoms of neuritis are subjective, and the doctors have to rely upon the patient's statement as to whether or not he has pain, this court said: "Under the testimony of the medical experts, the nature of appellee's complaint could be diagnosed only upon his statement. If appellee was telling the truth, his trouble was neuritis, and the testimony of the experts, as quoted, those called both by appellee and appellant, raised the issue of permanent total incapacity. While not controlling, it was a circumstance for the jury that appellee, an honorable man, had done no work since his injury. All the testimony reviewed was sufficient to raise the issue of total permanent incapacity." Our opinion in Lumbermen's Reciprocal Ass'n v. Anders (Tex. Civ. App.) 292 S. W. 265, also supports the construction we are giving the testimony on the issue of total permanent incapacity.

In testifying as an expert witness for appellee, Dr. Matlock referred to an X-ray picture which he said was made by Dr. Ledbetter. Appellant reserved a bill of exceptions to this testimony on the ground that the picture had not been identified. The court qualified this bill with the statement that "the proof showed, as per statement of facts, that said X-ray picture was identified." The statement of facts fully supports the court's qualification.

■ The court did not commit reversible error in permitting the witness Lee James to testify, as quoted above, that, before his injury on March 4, 1930, appellee was "an able bodied man able to do heavy work," and that he had not seen him do any heavy work since that time.

■ The following question was not leading, in the sense that it amounted to reversible error:

"Q. Mr. Bailey, did you or did you not receive an injury while working for the Gulf Refining Company at Port Arthur, Texas, on or about March 4, 1930?

"Q. What is your answer to that? A. I did."

■■ Issue No. 12 was as follows: "Do you find, from a preponderance of the evidence that plaintiff's injuries, if any, were the producing cause of his disability to work and earn money, if any?" The evidence showed that appellee had suffered injuries prior to the one in issue in this case. On the basis of this old injury appellant asserts it "was reversi-

ble error for the trial court over the timely objection of appellant to submit Special Issue No. 12, requiring the jury to find from a preponderance of the evidence whether plaintiff's injuries, if any, were the producing cause of his disability to work and earn money." The argument is that the use of the word "injuries" in this issue permitted the jury to consider the prior injuries in their answer to this question. This objection is overruled. As submitted, the issue was not error. But any possible theory that the jury was misled is answered by the negative answer given by the jury to the following special issue requested by appellant: "From the preponderance of the evidence, please state what percentage of incapacity, if any, the claimant, W. D. Bailey, has suffered, is due to said previous injury." Also, in our judgment, the objection to this issue was not sufficient to support appellant's argument and proposition. The objection was as follows: "Defendant objects to Special Issue No. Twelve (12) because said question is improperly stated, and because under the law in such cases where there has been a previous injury the jury's finding that the latter injury is a producing cause is not the proper basis and cannot be made the basis for entering up a judgment for any amount compensation insurance."

██ Appellee pleaded his average weekly wage as follows:

"(a) Plaintiff alleges that he had worked in the employment in which he was working at the time of the injury, either for the same employer or some other substantially the whole of the year immediately preceding the injury, and that his average weekly wages should thereby consist of three hundred (300) times the said average daily wages or salary which he had earned and which he was earning in the said employment during the time he was so employed; and that his average weekly wages would thus be a one-fifty-second (1/52) part of his said annual average wages;

"(b) If plaintiff be in error as to his allegations under subsection (a) hereof, then in the alternative he shows unto the court that if he did not work in such employment during substantially the whole of the year next preceding his injuries, then he is entitled to recover on the basis of his average weekly wages calculated as three hundred (300) times the average daily wage or salary which an employee of the same class working substantially the whole of the year preceding his injuries, in the same or in a similar employment, in the same or in a neighboring place, would have earned in such employment during the time when so employed, and plaintiff alleges that such average daily wages or salary was and is the sum of Seven & 50/100 ($7.50) Dollars a day and that thus his average weekly wages would be a one-fifty-second (1/52) of his said average annual wages as thus estimated.

"(c) If plaintiff be in error as to his allegations under the foregoing subsections (a) and (b), then, in the alternative, he respectfully shows unto the court that he is entitled to have his average weekly wages estimated and determined under circumstances as provided by law, that when by reason of the shortness of time of employment of the employee, or other employee engaged in the same class of work, in the manner and for the length of time specified in the above subsections (a) and (b), or for other good and sufficient reasons, it is impracticable to compute the average weekly wages as above defined, then it shall be computed in any manner that may seem just and fair to both parties and plaintiff alleges that a just and fair basis and estimate herein would be and is the rate of Seven & 50/100 ($7.50) Dollars a day, thereby entitling plaintiff to the sum of Twenty ($20.00) Dollars a week compensation, same being sixty (60%) per cent. of his average weekly wages; on whichever basis as above alleged such estimate is made."

This pleading was sufficient to raise the three several bases for calculating average weekly wage, as prescribed by subsections 1, 2, and 3 of section 1 of article 8309. The evidence did not raise the issue of average weekly wage under subsection 1, but was sufficient to raise the issue under subsection 2. Appellee testified: "I am familiar with the wage like employees doing the same or similar work that I was doing at the time of my injury in this or a neighboring community received for a period of 52 weeks or a year before the time of my injury. That was 75 cents an hour; standard wages at the refinery. Working 10 hours a day, six days a week; that would make weekly wage of $45.00."

Lee James testified, covering the period of time from January 14, 1929 to July 3, 1932:

"Q. Do you know of your own knowledge how much carpenters were earning at that time?

"Q. Let me change it—at the Gulf Refining Company at the time and for a year before, what were carpenters getting during that time, if you know. A. Getting seventy-five cents and more.

"Q. Seventy-five cents and more, you mean by the hour? A. Yes sir.

"Q. That would be $7.50 a day? A. Yes sir."

Being raised by the evidence just quoted; the issue was properly submitted by special issue No. 16 as follows: "What do you find; from a preponderance of the evidence, was the average weekly wage calculated under the following instruction, by which you will be guided in your answer to this issue? Answer

by giving the amount in dollars and cents. 'Average weekly wages' if the injured employee did not work in such employment during substantially the whole of the year immediately preceding the injury, shall consist of a one-fifty-second part of three hundred times the average daily wage or salary which an employee of the same class working substantially the whole of such immediately preceding year, in the same or in a similar employment, in the same or a neighboring place, shall have earned in such employment during the time when so employed." And found in appellee's favor in the sum of $34.66. This evidence of the witness Lee James was not subject to the objection that it was without support in the pleadings and, construed in the light of all his testimony, was not subject to the further objection that it was too indefinite as to place and time.

 Issue No. 16 was not subject to appellant's exceptions that it was "badly misleading, confusing, meaningless, unsupported by the pleadings or the proof," nor was it "complex, and ambiguous, making it almost impossible for the jury to understand the same." But these exceptions were too general to point out error. Isbell v. Lennox, 116 Tex. 522, 295 S. W. 920.

 Appellee offered no evidence on the issue of a fair and reasonable rate of discount as a basis for calculating a lump sum settlement. So the answer to issue No. 14, fixing this rate at 6 per cent., was without support in the evidence, because at the time this case was tried the issue of a proper rate of discount was a question of fact to be found by the jury. However, on May 27, 1931, the Governor approved House Bill No. 877, Acts 42nd Legislature (1931), c. 248, brought forward by Vernon's Ann. Civ. St. as article 8306a, providing that present payments on lump sum settlement are to be made upon a discount of 6 per cent. interest, compounded annually. Appellant does not complain that the jury erred in finding the facts entitling appellee to a lump sum settlement, but only that he failed to establish by evidence a proper basis for calculating the discount. On this statement, if this proposition constitutes reversible error, it would be our duty to reverse the case with instructions to submit to the jury only the issue of a proper discount. On such resubmission, under article 8306a, it would be the duty of the court to instruct a verdict at a discount of 6 per cent. Under the following rule announced by 3 Tex. Jur., § 777, it is our duty to render the judgment that the lower court would be compelled to enter upon a new trial: "Although the ruling complained ·of was erroneous when made, the judgment will not be reversed where the dispute involves only a question of remedy or procedure, and the remedy adopted or procedure followed

in the trial court is authorized by a statute in force at the time when the appeal comes up for hearing. In such case it would not profit an appellant if the judgment were reversed and the cause remanded, for the new trial would be had pursuant to the provisions of the statute enacted since the previous trial." We gave this statute this construction in Traders & General Ins. Co. v. Powell (Tex. Civ. App.) 44 S.W.(2d) 764. So, though the rate of discount allowed by the court was error when the judgment was entered, the error was cured by the enactment of article 8306a.

This case was correctly tried, and the judgment of the lower court is in all things affirmed.